[No. B083951. Second Dist., Div. Seven. Dec. 13, 1995.]

EARL CUMMINGS, JR., Plaintiff and Appellant, v.
CIVIL SERVICE COMMISSION OF LOS ANGELES COUNTY,
Defendant and Respondent.

1644

**Counsel**

Donald Peckner for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, and Manuel A. Valenzuela, Deputy County Counsel, for Defendant and Respondent.

**Opinion**

**WOODS (Fred), J.**—Because the civil service commission acted well within its discretion in discharging Deputy Probation Officer Earl Cummings, Jr., for misusing his authority, violating confidential records, and lying to other governmental officials and his own superiors, we affirm the judgment.

We also affirm the principles Justice Johnson expressed recently and well for this unanimous court: a deputy probation officer's "job is a position of trust and the public has a right to the highest standard of behavior from those they invest with the power and authority of a law enforcement officer. Honesty, credibility and temperament are crucial to the proper performance of an officer's duties. Dishonesty is incompatible with the public trust. Abuse of power cannot be tolerated." (*Talmo* v. *Civil Service Com.* (1991) 231 Cal.App.3d 210, 231 [282 Cal.Rptr. 240].)

PROCEDURAL BACKGROUND

In September 1992, Paul Higa, chief of the Juvenile Institutions Bureau of the Los Angeles County Probation Department, ordered an internal investigation of Deputy Probation Officer Cummings's having obtained information about Carmichael Flowers from confidential records of the Department of Corrections and Riverside Police Department.

Fernando Lopez, the administrative supervisor of the internal affairs unit and a 24-year probation department employee, conducted the investigation. His November 17, 1992, report found true allegations that Cummings, without authorization, had reviewed Carmichael Flowers's confidential parole file and had obtained Flowers's arrest record from the Riverside Police Department.

Bureau Chief Higa thoroughly reviewed this internal affairs report, read Cummings's master personnel file, weighed the department's discipline guidelines, and then on December 18, 1992, sent an "intent to discharge letter" to Cummings. Thereafter, Mr. Higa personally met with Cummings to obtain additional information from him.

On January 27, 1993, the probation department discharged Cummings.

Cummings appealed his discharge and requested an administrative hearing.

The hearing occurred on June 11, 1993. Cummings was present and represented by William D. Ruffin. The probation department was represented by Ms. Marilyn Turner. The proceeding was reported and its record consists of 157 reporter-transcript pages and 21 exhibits. The hearing officer's findings of fact confirmed Cummings's admitted wrongdoing. The hearing officer, however, recommended only a 60-day suspension.

On September 22, 1993, the civil service commission accepted the hearing officer's findings of fact, rejected his discipline recommendation, and sustained the probation department's discharge of Cummings. Cummings was informed that failure to object to this commission decision by October 12, 1993, would result in its becoming final on that date. On October 13, 1993, no objection having been received from Cummings, the decision became final.

On January 7, 1994, Cummings filed a petition for writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) His petition conceded wrongdoing

but contended the penalty of discharge was excessive and an abuse of discretion.

On March 4, 1994, the matter was heard by the trial court. On April 1, 1994, the trial court denied the petition. This appeal followed.

## Factual Background

Earl Cummings, Jr., became a probation department employee on December 20, 1976, and a deputy probation officer on April 1, 1981. Five months later, on September 4, 1981, he was demoted. In 1985 Cummings again became a deputy probation officer.

On his 15 annual performance evaluations Cummings was rated "competent" 14 times and "very good" once. He never received an "outstanding" rating.[1]

On May 14, 1981, Cummings used unnecessary and excessive force on a minor. The minor received an injury to his head which required sutures. Cummings received a two-day suspension.

On August 3, 1984, Cummings, in the presence of staff, called a fellow employee an "asshole," threatened to kill him, and pushed him to the floor.

On August 11, 1984, during a recreation activity, Cummings was asked by a fellow employee to lower the volume of music being played on the outdoor speakers. Cummings first *raised* the volume and then "cut if off completely." Cummings then left his control center post, confronted the fellow employee in the field, and shouted profanities at him. "This outburst . . . was observed by other staff and by numerous minors." When another staff member asked Cummings to desist, he said, "I don't give a fuck."

For these acts of misconduct Cummings was suspended one day. The suspension order stated: "These episodes reveal a serious disregard for policy and a pattern of unprofessional behavior inappropriate for a staff member of your experience and knowledge."

On October 3, 1984, Mr. Tatley, Cummings's supervisor, ordered Cummings to correct his time card. Cummings was insubordinate and "refused a direct order." Mr. Tatley ordered Cummings to report to Mr. Tatley's office "but . . . once again [he was] insubordinate and refused to comply." Cummings was suspended for three days.

---

[1] The contrary statement in the hearing officer's report is just one of many errors that report contains.

On October 30, 1984, Cummings had an altercation with a fellow employee and pushed him to the ground. Cummings was suspended one day.

In October 1991 Cummings met Robin[2] Barber and, although he was married, began dating her. During their relationship, according to Robin, Cummings removed photographs of her from her tote bag. When confronted, he first told her he had received them in the mail but had not saved the envelopes. Later, "[w]hen pressed, he confessed to her he took some pictures from her tote bag."

In May 1992 Robin "broke up" with Cummings and resumed her relationship with Carmichael Flowers whom she had known and dated since 1977.

On June 5, 1992, Robin married Carmichael Flowers and on June 10, 1992, told Cummings.

Thereafter, Robin told investigator Fernando Lopez, Cummings tried to break up her marriage by telling her frightening and inflammatory things about her husband. He also told these things to Robin's mother, who suffered from hypertension. Robin said this additional stress caused her mother's death.

On July 10, 1992, Robin told Cummings she was having marital problems, that her husband was on parole and had stolen her gun.

On July 20, 1992, Mr. Flowers stole Robin's car from her workplace parking lot.[3] She informed Cummings.

Prior to July 30, 1992, Cummings telephoned Flowers's parole officer Rita Arreguin and told her he was investigating the suitability of placing minor Ramon Parker in the household of parolee Flowers. He said Ramon Parker was Flowers's stepson. This was a total fabrication.

On July 30, 1992, Cummings arrived at the Riverside parole office and identified himself to Mr. Sanchez, Ms. Arreguin's supervisor, as a deputy probation officer. He explained his "placement investigation" to Mr. Sanchez and assured him that was his only interest in seeing the Flowers file. Cummings was then allowed to read the confidential file. While doing so, Ms. Arreguin arrived. She told Cummings she had been on vacation and then briefed him regarding Flowers having reportedly stolen his wife's gun and,

---

[2]As we explain, Robin Barber later married Carmichael Flowers. To avoid name-change confusion we refer to her as Robin.

[3]Mr. Flowers drove out of state to be with his mother. Robin soon joined him there.

later, her car. She said a warrant for Flowers's arrest had issued. Cummings did not reveal to Ms. Arreguin that he had met Flowers and already knew about the gun and car. Instead he told her "there was no need to pursue the [placement] matter further . . . ."

Cummings left the parole office and went to the Riverside Police Department. There he again identified himself as a deputy probation officer. He requested and was given a copy of Carmichael Flowers's arrest record.

In August 1992, following his arrest, Mr. Flowers learned from Ms. Arreguin that a deputy probation officer named Earl Cummings had been allowed to read his parole file. On August 15, 1992, Mr. Flowers registered a formal complaint[4] stating, "My Central file was given to my wife's ex-lover who used the information in an attempt to destroy my marriage." This complaint was received by Department of Corrections Unit Supervisor Suzzette Wilson.

Two days later, on August 17, 1992, Ms. Wilson telephoned Cummings's supervisor, John Nilsen. She informed him of Mr. Flowers's allegations that Cummings was his wife's ex-lover and had used information from Mr. Flowers's confidential file to "create marital discord" and had also communicated this information to Flowers's mother-in-law.

Mr. Nilsen immediately asked Cummings about these allegations. Cummings denied them. Cummings repeated his "placement investigation" fabrication. He elaborated upon that fabrication by falsely stating he had learned of Flowers's mother-in-law's address from Flowers's parole file and had gone there to verify Flowers's place of residence. In fact, Cummings had frequently been at that residence and spent time with Robin's mother during the months he had dated Robin.

Mr. Nilsen accepted Cummings's explanation and "relayed" it to Ms. Wilson. Based upon Mr. Nilsen's "verification," on August 24, 1992, Ms. Wilson rejected Flowers's complaint. She informed him there had been no impropriety because "Mr. Cummings was conducting an investigation regarding custody of your stepson Parker."

In addition to these oral communications between Mr. Nilsen, Ms. Wilson, and Cummings, Mr. Nilsen received a follow-up letter from Ms. Wilson dated August 20, 1992. It concluded "I have enclosed a copy of parolee Flowers's complaint as well as my response at the Informal Level. I have enclosed my business card and wait for your response."

---

[4]Mr. Flowers also complained to Chief Probation Officer Barry Nidorf, the Riverside Police Department, the Riverside District Attorney's Office, and the grand jury.

In order to accurately respond to Ms. Wilson, Mr. Nilsen provided her letter to Cummings and requested a written report from him.

On or before September 4, 1992, Cummings gave Mr. Nilsen his two-page, typed, and signed (but undated) response to Ms. Wilson's letter and Flowers's allegations. His report reiterated the events of July 30, 1992, and repeated his fabricated "placement investigation" explanation. His report unmistakably and falsely indicated that he did not personally know Carmichael Flowers, Robin Flowers, or her mother, Erlean Marshall. He even added dramatic touches. Describing his arrival at Ms. Marshall's house on July 30, 1992, at 12:15 p.m., he wrote "[I] presented my I.D. along with a card indicating my title." Cummings baldly stated "the allegation that I was his wife's lover and created marital discord between he and his wife is false." He added, "Furthermore, I didn't misrepresent myself, in any matter."

On September 4, 1992, Mr. Nilsen wrote to his superiors, Mr. Higa and Mr. Simpson, outlining the subject events and enclosing Ms. Wilson's August 20 letter, Mr. Flowers's formal complaint, and Cummings's two-page report.

On September 16 and September 21, 1992, Flowers wrote to Chief Probation Officer Barry Nidorf and detailed the subject events. Mr. Nidorf forwarded these letters to Mr. Higa.

On September 24, 1992, Probation Department Bureau Chief Stanley telephoned Mr. Nilsen and told him there was no court ward named Ramon Parker and no "placement investigation" of such a person. He said Cummings had misrepresented these facts and was now the subject of an investigation.

After this call, Mr. Nilsen—still unaware Cummings had lied about not being Robin's ex-lover, not knowing Robin's mother, and not knowing Flowers—asked Cummings if he was dating a court-ward's mother. Cummings, allowing his superior to remain deceived, assured him "this was not the case."

The internal affairs investigation quickly established Cummings's fabrications, misrepresentations of authority, and unauthorized reading of Flowers's confidential parole file. Cummings admitted all of these acts to investigator Fernando Lopez and admitted them again in his October 9, 1992, affidavit.

His admissions included an explanation. Cummings told investigator Lopez and stated in his affidavit that "On July 20, 1992 Mr. Flowers stole

Robin [*sic*] car from the parking area at her work location. I was later told that Mr. Flowers had taken keys belonging to Robin and my door key was among these keys. I immediately became fearful in that now I had a parolee with a gun and that was mobile and there was a possibility that he had my door key."

Cummings did not explain why, if he feared for his safety, he did not report Flowers's thefts and dangerousness either to the police or to the parole authorities.

At the June 11, 1993, administrative hearing, eight months after his original explanation, Cummings added a second explanation: it was his superior, Mr. Nilsen's fault. Cummings testified that shortly after the July 5, 1992, gun theft he reported the matter to Mr. Nilsen. Cummings stated the date was July 10, 11, or 12 when he told Mr. Nilsen he "had received some threats from a parolee and that he had stolen a gun." Cummings further stated that Mr. Nilsen said "he didn't want to hear it" and he, Cummings, "became very angry about it and I had a few words with Mr. Nilsen in regards to why . . . ." It was Mr. Nilsen's rejection which caused Cummings "to take actions [*sic*] into [his] own hands."

This second explanation was accepted and relied upon by the administrative hearing officer. It is not supported by substantial evidence. We explain.

In his affidavit and in his interview with Investigator Lopez, Cummings stated that it was not until *after* July 20, 1992, when he learned Flowers had stolen a car and might have a key to his, Cummings's, house that he became "fearful." Yet Cummings testified he asked Mr. Nilsen for help July 10-12, 1992.

On August 17, 1992, approximately a month after Cummings claims to have informed Mr. Nilsen about parolee Flowers, the gun theft, and the threats—supposedly a memorable meeting punctuated by Cummings's anger and "a few words" to his superior—Mr. Nilsen called Cummings into his office and asked him about the allegations that Ms. Wilson, from the Department of Corrections, had just related to him.

Cummings not only did *not* say "Don't you remember, we talked about this a month ago, this is the parolee who stole a gun and threatened me" but instead disclaimed any relationship with Flowers or with his wife Robin. Cummings told Mr. Nilsen the "placement investigation" story.

Had Cummings told Mr. Nilsen about parolee Flowers in July, the August phone call from Ms. Wilson would *not* have been a surprise and Mr.

Nilsen would not have accepted Cummings's denials and verified those denials to Ms. Wilson.

Mr. Nilsen told Investigator Lopez that Cummings had *not* apprised him of problems with parolee Flowers.

In his September 4, 1992, report to Mr. Nilsen, Cummings made no reference to telling Mr. Nilsen about parolee Flowers in July.

In his October 9, 1992, affidavit, a chronological detailing of all the relevant events, Cummings made no reference to a July meeting with Mr. Nilsen.

DISCUSSION

1. *Standard of Review*

■ "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306]; *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774]; 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, §§ 264, 265, p. 892; Cal. Administrative Mandamus (Cont.Ed.Bar 2d ed. 1989) § 4.87, pp. 149-150.)

This court acknowledged the applicable abuse of discretion standard in *Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d 210, 226. Justice Johnson explained that, in a mandamus proceeding, an appellate court vis-à-vis *the trial court*, conducts a de novo review concerning possible abuse of discretion by the administrative agency. (*Id.* at pp. 226-228.) The trial court's determination of abuse or nonabuse of discretion by the administrative agency is of no concern to the appellate court. The appellate court gives no deference to the trial court's determination. It makes its own determination, de novo.

Conversely, as Justice Johnson made clear, in a mandamus proceeding an appellate court vis-à-vis *the administrative agency*, does *not* independently or "de novo" determine penalty. "[A] court cannot substitute its discretion for that of the administrative agency on the degree of punishment to be imposed." (*Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d at p. 228.)

2. *Application of Standard of Review*

■ As Justice Johnson stated: "In reviewing the exercise of this discretion we bear in mind the principle '[c]ourts should let administrative boards

and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere. [Citations.] The 'overriding consideration' in cases of public employee discipline 'is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." ' " (*Talmo* v. *Civil Service Com.*, *supra*, 231 Cal.App.3d at p. 230.)

We find no abuse of discretion by the civil service commission discharging a deputy probation officer who misrepresented his authority to the Department of Corrections and to the Riverside Police Department, and who violated confidential parole records and lied about doing so orally and in writing to his superiors with knowledge they would rely upon those lies and communicate his false information to other governmental agencies.

"When an officer of the law violates the very law he was hired to enforce and lies about it to his superiors he forfeits the trust of his department and the public." (231 Cal.App.3d at p. 230.)

### DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

Mr. Cummings began work as a probation officer with the Los Angeles County Probation Department (Probation Department) in August 1976. Prior to the incidents at issue in this case he received three minor disciplinary actions, the most severe of which was a three-day suspension more than nine years earlier. None of those incidents involved dishonesty. Since those incidents, the civil service commission found, Cummings had "an exemplary record . . . and his last evaluation was outstanding."

The incidents which resulted in Cummings's discharge arose in 1992 when, for personal reasons, he used the color of his authority as a probation officer to obtain confidential information from the California Department of Corrections and the Riverside Police Department regarding the husband of a woman with whom Cummings had a romantic relationship. Cummings then lied to his supervisor about obtaining this information.

The undisputed evidence showed Cummings obtained this information because he had been threatened by the husband who had a gun, a car, and the

keys to Cummings's apartment and, Cummings believed, was mentally unbalanced. The record also shows, without dispute, Cummings first went to his supervisor with his concerns but the supervisor told Cummings "he didn't want to hear about it." It was after being rebuffed by his supervisor that Cummings decided to take matters into his own hands. There was no evidence Cummings actually used the information he obtained about the husband or that he obtained the information for personal financial gain. All the evidence points to the conclusion Cummings obtained the information out of fear for his safety and the safety of those with whom he worked.

After receiving a notice of discharge from the Probation Department, Cummings requested a hearing by the Los Angeles County Civil Service Commission (Commission). The hearing officer found the facts described above and recommended the discharge be rescinded and Cummings be given a 60-day suspension without pay instead. The Probation Department objected to the hearing officer's proposed decision. The Commission adopted the hearing officer's findings of fact but sustained the discharge. Cummings then initiated this action for administrative mandamus. The only issue in the trial court and on appeal is whether the Commission abused its discretion in sustaining the discharge. For the reasons explained below, I conclude there was an abuse of discretion in this case.

The infractions Cummings committed, all of which were first offenses, carry a range of punishment from a warning or a few days' suspension to discharge from employment. Such a broad range of punishment for a first offense clearly evidences an intent dismissal should result only under the most egregious circumstances. Otherwise there would be no point to providing more severe punishment for second offenses and mandatory discharge for a third offense.

Our Supreme Court has stated in considering whether an abuse of discretion has occurred in the context of public employee discipline, ". . . the overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in '[h]arm to the public service.' . . . Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence. . . ." (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 218 [124 Cal.Rptr. 14, 539 P.2d 774], internal citations omitted.)

Consideration of these principles in the present case leads me to conclude the discipline imposed on Mr. Cummings was clearly excessive.

As to "harm to the public service," Cummings committed two acts of dishonesty: improperly using his office to obtain confidential information

regarding a parolee and lying about his actions to his supervisor. Dishonesty is clearly a serious offense in the workplace, especially among employees imbued with the public's trust. However, I have found no case, and the Commission has not cited one, upholding the firing of a public employee for dishonesty *not* involving personal financial gain.[5] (Cf. *Barber* v *State Personnel Bd.* (1976) 18 Cal.3d 395 [134 Cal.Rptr. 206, 556 P.2d 306] [theft of a wristwatch]; *(Paulino* v. *Civil Service Com.* (1985) 175 Cal.App.3d 962 [221 Cal.Rptr. 90] [filing false sick leave reports]; *Ackerman* v. *State Personnel Bd.* (1983) 145 Cal.App.3d 395 [193 Cal.Rptr. 190] [theft of state property for personal use]; *Wilson* v. *State Personnel Bd.* (1976) 58 Cal.App.3d 865 [130 Cal.Rptr. 292] [filing false travel claims; use of state vehicle for personal business].) It is also worth noting on the issue of honesty or lack of it, Paul Higa, the Probation Department official who authorized Cummings's discharge, was never told by Cummings's supervisor that Cummings first had come to him for assistance and been refused. Mr. Higa testified had he known this he might have changed his mind about discharging Cummings.

Turning to the circumstances surrounding the misconduct and the likelihood of its recurrence, I conclude the mitigating circumstances surrounding Cummings's misconduct demonstrate his discharge was an abuse of discretion. Cummings was faced with a jealous husband who was not only under psychiatric care but had a criminal record, was armed, had transportation and had the keys to Cummings's apartment. Cummings went to his supervisor for assistance but was rebuffed. With hindsight, the Commission suggests other steps Cummings could have taken to protect himself such as going to the police to report the threats against him and identify the person making them. The action Cummings did take, however, was nonviolent, did no harm to the husband or the Probation Department and is unlikely to recur.

The majority's reliance on *Talmo* v. *Civil Service Com.* (1991) 231 Cal.App.3d 210 [282 Cal.Rptr. 240] is misplaced. Talmo, a sheriff's deputy, was discharged for "bizarre behavior and unprofessional conduct.' " (*Id.* at p. 214.) This conduct included abuse of jail inmates and lying about these acts to his superiors. In one instance, Talmo lifted up the bed of a sleeping prisoner and tipped it over, causing the prisoner to fall to the floor face first and suffer a bloody nose. Talmo lied about this incident, claiming the prisoner had tipped the bed over himself in his sleep. In another incident Talmo placed a dead gopher in a prisoner's pocket. He not only lied about doing this but attempted to get another deputy to lie on his behalf. Talmo

---

[5]The one possible exception is *Nicolini* v. *County of Tuolumne* (1987) 190 Cal.App.3d 619 [235 Cal.Rptr. 559] (deputy sheriff altered Valium prescription to an increased amount). However, Nicolini's firing was based on charges in addition to dishonesty.

had previously served a two-day suspension for having inhumanely hand-cuffed two inmates in a holding cage. Talmo also had telephoned a jail guard and called him a "fucking snitch" and "nigger" and had poured dirt into the gas tank of a county vehicle. (*Id.* at pp. 214-215.) It was clear from Talmo's behavior he was not mentally suited to hold a position of power and public trust such as deputy sheriff. The fact Talmo lied about his abuse of prisoners was not the justification for his firing. His abusive and bizarre behavior was sufficient in itself to demonstrate Talmo was not qualified to serve in a position of power and public trust such as deputy sheriff.

Therefore, I would reverse the judgment in this case.