Opinion
 

 CROSKEY, Acting P. J.
 

 Laura Davis appeals from the judgment of the superior court, which denied Davis’s petition for a writ of mandate (Code Civ. Proc., § 1094.5) compelling the Civil Service Commission of the County of Los Angeles (the Commission), the county’s department of health services (the Department), and Nursing Director Michael Sue Cronin (Cronin) to reinstate Davis in her position as a supervising staff nurse I at the Los
 
 *680
 
 Angeles County/University of Southern California (LAC/USC) Medical Center. On December 29,1993, Davis was terminated from her employment, effective December 27, 1993, for repeatedly threatening to kill her immediate supervisor, Nurse Manager Kimberly Cooper (Cooper).
 

 Davis appealed the discharge and requested a hearing before the Commission. A hearing was held on June 6 and 7, October 6 and 7 and November 18, 1994, after which the hearing officer found that Davis made explicit, repeated, willful, unequivocal, unconditional, immediate and specific threats to kill her supervisor, with the specific intent that the threats be taken as threats; and that the threats placed the supervisor in reasonable fear for her safety. The hearing officer therefore concluded, among other things, that Davis’s discharge was appropriate, and recommended that the discharge be sustained. The Commission adopted its hearing officer’s findings and recommendation by an order issued May 17, 1995.
 

 Davis filed her petition for writ of mandate on August 15, 1995. After a hearing held on May 31, 1996, the petition was denied.
 

 We find no errors in the proceedings below, and we find that the judgment is supported by substantial evidence. We therefore affirm the judgment.
 

 Factual and Procedural Background
 

 Davis was a permanent employee of the county, employed by the Department at its LAC/USC Medical Center, Women’s Hospital since January of 1977. She was originally hired as a licensed vocational nurse, but she became a registered nurse in 1984 and was promoted to supervising staff Nurse I in 1987. It was Nurse Manager Cooper who recommended the promotion.
 

 Davis’s employment record was good for most of her tenure with the Department, but during her last year of employment, she was initially counseled, and later reprimanded, by Cooper for inappropriate conduct, including engaging in one verbal and one minor physical altercation with other employees, using excessive sick leave and providing inadequate notice of a planned absence. On June 21, 1993, Cooper wrote Davis two letters of reprimand. The first was for engaging in an inappropriate verbal altercation with another nurse on June 10. The second was for calling in sick on the night of June 16, 1993, although Davis had in fact planned for some time to be absent that shift and had told coworkers of her plans. The letter stated that, as a result of Davis’s failure to arrange for someone to fill her responsibilities that night, only one registered nurse and two nursing assistants were available to care for thirty-five patients. Both letters concluded by
 
 *681
 
 warning Davis that future failures to comply with rules would result in disciplinary action, such as suspension or demotion.
 

 On June 29, Cooper came to work at 5 in the morning so that she could give Davis the two June 21 reprimand letters and discuss them with her. However, before she had the chance to talk with Davis, Cooper, who was pregnant, suffered a hemorrhage and was put into a room and cared for by Davis and other staff. Davis washed and cleaned Cooper’s clothes, then came into the room to see Cooper, whereupon Cooper told Davis that she had come in early for the purpose of giving Davis the reprimand letters. Davis told Cooper not to worry about that right then, as everyone was concerned only about Cooper’s condition. Davis told Cooper she would call the hospital after she got home to check on Cooper.
 

 Evidently, Cooper did not give Davis the reprimand letters, as they were later given to Davis by one Isabel when Davis completed her shift at 6 a.m. Davis refused to accept the letters and told Isabel to put them in her mailbox. Davis cried all the way home from work. She testified at the hearing that she did telephone Cooper later in the day to check on her condition. She was told Cooper was still in bed.
 

 On the evening of June 29, Davis went to work at her scheduled time, but, instead of commencing her shift, she went to the nursing office and filled out an industrial accident form, claiming occupational stress. After filing the form, Davis was referred to White Memorial Hospital where hospital staff attempted to admit her for a psychiatric observation. During an interview at White Memorial, she was asked whether she believed she was in danger of harming herself or anyone else. She answered that she did not, but in a later interview with a workers’ compensation investigator, she stated that “really within [she] wanted to kill the head nurse. . . .”
 

 Workers’ compensation investigator Carol Smith interviewed Davis about her occupational stress claim on August 9, 1993. The interview was tape-recorded. At the beginning of the interview, before the tape recorder was turned on, Smith asked Davis whether she had taken any medications prior to the interview. Davis answered that she had purposely not taken any medications because they put her to sleep, and she knew she would need to be awake for the interview. However, Davis testified at the hearing before the Commission referee that she had, in fact, taken medications. She said she had taken “some of everything”—specifically, Valium, klonopin, feldene and Motrin.
 

 Over the course of the hour-long taped interview, Davis complained of suffering from varicose veins and arthritis, as well as stress-related physical
 
 *682
 
 symptoms, including chest pains, anxiety attacks and daily fits of anger. Davis became increasingly agitated when discussing her relationship with Cooper, stating that she felt exploited and unappreciated by the hospital management generally and by Cooper in particular. Davis said that, “I bear all the burden, but I never get a thank you. I’ve still never gotten a thank you since she’s been there.” Davis repeatedly requested to be assigned to a floor or station where she would not be under Cooper’s supervision.
 

 Approximately 10 minutes before the end of the interview, Smith asked if there was anything else Davis would like to add. Davis asked how Smith was going to help her. Smith responded by asking what would happen if Davis returned to work and there were no change in her floor assignment or working conditions. Davis answered, “I’ll kill her.”
 

 Smith asked if Davis was speaking figuratively when she said she would kill Cooper. Davis answered, “Figuratively? This is what she’s been doing. It’s just like obnoxious. No respect, period. No thank you, no nothing. It’s just like I don’t exist, but you do this work. I’m not going to tolerate it anymore. The next time she does it, I’m going to kill her.” Over the course of the next 10 minutes, Davis stated approximately 6 times, in a voice which Smith considered “aggressive,” that she would kill or “get” Cooper if Cooper said “one more nasty thing” to Davis or if Davis were required to return to work under Cooper’s supervision, and that if Cooper confronted Davis or walked in front of her, “it all depends on how I feel as to what might happen to her.” In response to a suggestion that Davis might consider seeking other employment, Davis responded, “Maybe I can go in and work under somebody and just go look for work after that. Because I’m not going in under her. Because my only intent when I go in is to get her.” Davis further stated, “You should put it on tape. You can tell the judge. You can tell anybody. But should she open her mouth and say anything to me, except thank you, I’ll kill her.”
 

 Smith informed Cooper of Davis’s threats and stated that Davis seemed very serious about them. Cooper then reported the threats to the LAC/USC Medical Center personnel liaison; Cronin; Cronin’s assistant, Rita Watson; and the medical center police. Cronin, Watson and a representative from the medical center police met with Cooper on August 11,1993, to plan measures for Cooper’s protection. Among other things, Cooper changed her arrival and departure schedule, changed her parking place, used different exits and entrances to the building, relocated her office, took several days off, and advised her staff to notify her and the security police immediately if Davis came into the hospital. In addition, Davis’s treating psychiatrist was contacted, informed of the threats Davis had made, and asked to delay Davis’s
 
 *683
 
 recommended retum-to-work date to August 31, 1993, from August 17, the date recommended in the doctor’s most recent “Certification of Disability And/Or return To work Or School.” The doctor did change Davis’s recommended return date, and, in addition, he made a notation on the retum-towork form that Davis should not be assigned to work under Cooper’s supervision.
 

 On August 17, Davis telephoned her coworker, Doris Aviles, at home. She told Aviles about her workers’ compensation interview and said that if she ever saw Cooper again, she was going to kill her. Aviles had heard Davis make threats against Cooper before, but she had not told anyone about the earlier threats. She took the August 17 threats seriously, however, and felt enough concern for Cooper’s safety that she told Cooper about the August 17 telephone call, and about a second call from Davis some time later, in which Davis again said she wanted to kill Cooper.
 

 When Aviles informed Cooper of the second call, it appeared to Aviles that Cooper took the threats more seriously than she had done after the first call. However, Cooper had in fact become very fearful and distracted from the time she first learned from Smith of the threats which Davis made during the worker’s compensation interview. Her fears were especially intense because of increasing workplace violence which was being reported throughout the United States, including an attack at the LAC/USC Medical Center just a few months past, in February of 1993, in which three emergency room physicians were shot. In addition, Davis had previously told Cooper and at least two other coworkers that Davis carried a gun in her car.
 

 On August 25, 1993, a second meeting was held concerning measures to be taken to protect Cooper from Davis. At that meeting, Art Allan, a supervisor in the medical center’s disciplinary unit, reported that he had read a transcript of Davis’s workers’ compensation interview and that he considered Davis’s threats serious. It was thus determined at that meeting that Davis would be terminated from her employment
 

 The severe measure of termination was taken in view of the same recent incidents of workplace violence which concerned Cooper personally. Such decisive action was considered consistent with a directive issued on January 16, 1992, which had been distributed to all county agencies by the chief administrative office of the county, directing all departments to take threats of violence in the workplace very seriously. The January 16, 1992, memorandum referred to several incidents of workplace violence which had occurred throughout the United States in the recent past, some of which followed overt threats which had been ignored or kept “in house,” owing to
 
 *684
 
 a lack of established procedures for dealing with such threats. The memorandum listed several categories of conduct which should be considered threatening, and listed procedures to be followed if such conduct should occur. The prescribed responses included, among other things (1) notifying receptionists, security personnel and other appropriate employees of the threat and providing them with a photograph of the threatening employee, (2) contacting law enforcement and the chief administrative officer, and (3) maintaining a log of events, notifications and contacts connected with the threat. The memorandum concluded with requirements which were to be followed “[i]f the employee was not terminated subsequent to the disposition of the incident . . . clearly implying that termination was a response which would be within a manager’s discretion if an employee made threats.
 

 The January 16, 1992, memorandum was supplemented by additional memoranda on the same subject on February 11 and 24, 1993. The memorandum of February 11, 1993, reminded department heads of the previous memorandum on workplace, stated that the importance of appropriate responses to workplace threats “cannot be overemphasized,” stated that the making of threats under certain circumstances is a crime, and quoted Penal Code section 422, which defines the crime of making terrorist threats.
 
 [1]
 

 In view of the serious threats made by Davis, and pursuant to the decision made on August 25 to terminate her employment, an “intent-to-discharge” letter was sent to Davis on September 8, 1997. A discharge letter, terminating Davis’s employment as of December 27, 1993, was sent on December 20. Davis’s threats against Cooper formed the primary basis for the discharge.
 
 [2]
 

 On January 12, 1994, Davis appealed the discharge and requested a hearing before the Commission. A hearing before a Commission hearing
 
 *685
 
 officer was held on June 6 and 7, October 6 and 7 and November 18, 1994 on Davis’s appeal. At the hearing, Davis testified that she did not remember making any of the threats reported by Smith or Aviles. She also testified that she did not know what Carol Smith meant by the word “figuratively,” when Smith asked if Davis was speaking figuratively when she said she wanted to kill Cooper.
 

 Based upon all of the evidence received at the hearing, the hearing officer made the following findings of fact: (1) during a workers’ compensation interview on August 9,1993 and in conversations with a fellow employee on August 17 and thereafter, Davis made explicit and repeated threats to kill her supervisor; (2) the threats were willfully made; (3) the threats were made with the specific intent that they be taken as threats; (4) the threats were unequivocal, unconditional, immediate and specific; and (5) the threats conveyed to the supervisor a gravity of purpose and immediate prospect of execution causing her to reasonably be in sustained fear for her safety. The hearing officer also made the following conclusions of law: (1) the charges made in the December 29, 1993, discharge letter were true; (2) Davis’s threats against Cooper constituted a violation of Penal Code section 422; (3) the threats compromised the Department’s responsibility to provide a safe environment for its employees, its patients and the public; and (4) Davis’s discharge was appropriate. The hearing officer therefore recommended that Davis’s discharge be sustained.
 

 On May 17, 1995, the Commission, with one dissenting vote, adopted the hearing officer’s findings and recommendation. Davis then filed her petition for writ of mandate, which was denied on July 1, 1996. This timely appeal followed.
 

 Contentions
 

 Davis contends that: (1) the judgment is not supported by substantial evidence; (2) Davis’s discharge was unlawful because the conduct upon which it was based bore no substantial relationship to Davis’s employment; (3) the discharge was unwarranted because Davis’s threats to kill her supervisor were not unequivocal, unconditional, immediate or specific within the meaning of Penal Code section 422 and were not made with the specific intent of carrying them out.
 

 
 *686
 
 Discussion
 

 1.
 
 Standard of Review
 

 Where, as here, a petition for writ of mandate is filed for the purpose of challenging the validity of a final administrative decision made after a hearing, the trial court inquires whether the administrative agency: (1) proceeded in excess of its jurisdiction; (2) afforded the petitioner a fair trial, or (3) abused its discretion. Abuse of discretion is established if (1) the agency did not proceed in the manner required by law, (2) the order or decision is not supported by the findings, or (3) the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subds. (a), (b).) Davis contends the Commission abused its discretion in that its findings are not supported by the evidence and its decision upholding Davis’s termination is not supported by the findings.
 

 Where it is contended that an administrative agency’s order is not supported by substantial evidence, and a fundamental right of the petitioner was affected by the administrative proceeding, the trial court independently reviews the agency’s factual findings.
 
 (Strumsky
 
 v.
 
 San Diego County Employees Retirement Assn.
 
 (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29];
 
 Barber
 
 v.
 
 Long Beach Civil Service Com.
 
 (1996) 45 Cal.App.4th 652, 658-659 [53 Cal.Rptr.2d 4].) Where the trial court has independently reviewed an administrative agency’s factual findings, an appellate court applies the substantial evidence test to the findings of the trial court.
 
 (Hittle
 
 v.
 
 Santa Barbara County Employees Retirement Assn.
 
 (1985) 39 Cal.3d 374, 388 [216 Cal.Rptr. 733, 703 P.2d 73].)
 

 Where, as here, it is contended that an administrative agency’s order is not justified by the agency’s factual findings, the trial court reviews the agency’s decision for abuse of discretion.
 
 (Skelly
 
 v.
 
 State Personnel Bd.
 
 (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774].) Upon review of the trial court’s judgment, an appellate court then reviews the agency’s order under the same abuse of discretion standard applied by the trial court, but the appellate court exercises independent review, of the
 
 trial court’s
 
 determination, according no deference to it.
 
 (Cummings
 
 v.
 
 Civil Service Com.
 
 (1995) 40 Cal.App.4th 1643, 1652 [47 Cal.Rptr.2d 775];
 
 Taimo
 
 v.
 
 Civil Service Com.
 
 (1991) 231 Cal.App.3d 210, 227-228 [282 Cal.Rptr. 240].)
 

 It is under the foregoing principles that we must consider Davis’s claims that: (1) the evidence did not support the Commission’s findings that Davis willfully made several explicit threats to kill her supervisor, which threats caused the supervisor to reasonably fear for her safety; and (2) the foregoing findings did not support Davis’s discharge.
 

 
 *687
 
 2.
 
 The Findings Are Supported by Substantial Evidence
 

 Davis first contends that the Commission’s findings were not supported by substantial evidence. There is simply no merit in this contention. Workers’ compensation investigator Carol Smith, who interviewed Davis about her occupational stress claim, testified credibly that: (1) Davis stated before the interview that she had not taken any medication; (2) Davis did not show signs during the interview of being under the influence of medications, and (3) Davis stated repeatedly during the interview that she would kill or “get” Cooper if Cooper said “one more nasty thing” to Davis or if Davis were required to return to work under Cooper’s supervision. Davis’s coworker Doris Aviles testified that Davis telephoned Aviles at home on two occasions and said during each conversation that she was going to kill Cooper if she ever saw her again. Several people who worked with Davis at the hospital testified that she had told them she had a gun, which she kept in her van. Finally, Cooper testified that, as a result of the threats, she became fearful and distracted, to the extent that she changed her arrival and departure schedule, relocated her office, took several days off, changed her parking place, used different exits and entrances to the building, and advised her staff to notify her and the police if Davis came into the medical center. Other administrative personnel at the hospital also read the threats in the transcript of Smith’s interview with Davis and considered them to be a serious cause for precautions.
 

 The foregoing evidence formed a sufficient basis from which the Commission, and the trial court upon independent review of the Commission’s findings, could conclude that (1) Davis in fact made the threats to which Smith and Aviles testified, (2) the threats were willfully made and were intended to be taken as threats; and (3) the threats conveyed to Cooper and other hospital personnel sufficient gravity of purpose to put them in reasonable fear for Cooper’s safety and that of others.
 

 3.
 
 Discharge From Employment Was Not an Abuse of Discretion
 

 Davis next contends her dismissal was too harsh a penalty for threatening on at least two occasions to kill Cooper. In support of this contention, Davis cites
 
 Blake
 
 v.
 
 State Personnel Bd.
 
 (1972) 25 Cal.App.3d 541 [102 Cal.Rptr. 50]. Blake, the petitioner in that case, was a Deputy Labor Commissioner, who had been employed in public service for more than 20 years and had a good employment record. However, one evening he became intoxicated at a State Bar convention and brandished a firearm at two fellow employees who were in the company of a woman attorney with whom Blake had a romantic relationship.
 
 (Id.
 
 at pp. 546-547.) Blake telephoned the victims the next morning, apologized and said such an incident
 
 *688
 
 would never happen again. He also sold his gun and ended his relationship with the woman involved in the incident.
 
 {Id.
 
 at pp. 553-554.) The Court of Appeal held dismissal was too harsh a penalty for Blake’s conduct, in view of all the circumstances surrounding the incident, the degree to which it affected the public service and the likelihood of such conduct recurring.
 
 {Id.
 
 at p. 554.) The
 
 Blake
 
 court noted that there was no direct testimony from the victims that their work relationship with the woman attorney was affected.
 
 {Ibid.)
 

 The circumstances of this case are not at all similar to those in
 
 Blake
 
 v.
 
 State Personnal Bd., supra,
 
 25 Cal.App.3d 541. Among other things, Davis made death threats against Cooper on at least two separate occasions to two separate persons under distinct circumstances. Both of the people who heard the threats took them seriously, and Davis never retracted them. Moreover, the threats clearly affected the public service, inasmuch as Cooper moved her office, changed her work schedule, took unscheduled time off of work, and despite all of these measures, was distracted and unable to concentrate on her work. The medical center police also took Davis’s threats seriously and responded by increasing security measures at the medical center.
 

 Davis argues that the Department, the Commission and the trial court should have taken into consideration the stress Davis was suffering and her fragile emotional condition, and should have reassigned her or extended her medical leave, instead of peremptorily terminating her employment after 16 years. That course might indeed have been a reasonable one. However, the course chosen by the Department was not unreasonable, and it was well within the discretion of the Department to discharge Davis for her repeated, cold-blooded threats against her supervisor, conduct which patently bore a substantial relationship to her employment.
 

 4.
 
 The Threats on Cooper’s Life Were Unequivocal and Specific
 

 Davis contends that, contrary to the finding of the Commission, her threats against Cooper were not unequivocal, unconditional, immediate and specific within the meaning of Penal Code section 422. It is not clear what significance Davis attaches to this final contention, inasmuch as she also contends that Penal Code section 422 has no application to proceedings to discharge an employee for insubordination. It is true that the hearing officer framed his findings of fact in language taken from Penal Code section 422 and included in his report a gratuitous conclusion that Davis had indeed violated that statute. The hearing officer described Davis’s threats as “unequivocal, unconditional, immediate and specific,” conditions which must be satisfied to prove a violation of the criminal statute, and also found that the
 
 *689
 
 threats were made “willfully” and “with the specific intent that they be taken as threats,” and that “the threats conveyed to [Cooper] a gravity of purpose and immediate prospect of execution causing [Cooper] to reasonably be in sustained fear for her safety,” all of which findings constitute elements of a violation of Penal Code section 422. However, it does not follow from the circumstance that the Commission hearing officer couched his description of Davis’s conduct in the language of section 422, that an employee’s threats against a supervisor
 
 must
 
 include all of the elements of the crime of making terrorist threats in order to justify discharge of the employee. Davis’s threats against Cooper, as related above, were plainly willful, and they were
 
 sufficiently
 
 unequivocal, unconditional, immediate and specific, and they
 
 sufficiently
 
 caused Cooper to be in reasonable fear for her safety to justify discharging Davis from county employment.
 

 Disposition
 

 The judgment is affirmed. Costs on appeal are awarded to the county.
 

 Kitching, J., and Aldrich, J., concurred.
 

 [1]
 

 Penal Code section 422 provides in pertinent part that, “Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family’s safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison. . . .”
 

 [2]
 

 Between the dates of the intent-to-discharge letter and the discharge letter, three anonymous and threatening telephone calls were made to Cooper or to her office. On November 9, 1993, an anonymous caller telephoned Cooper in her office. The caller first asked whether Cooper drove a Honda Accord. When Cooper said she did not, the caller repeatedly asked what make of car Cooper did drive, and, getting no answer, finally said, “Well, you’re going to die soon, and I just thought I’d call and tell you to be careful,” whereupon Cooper hung up and notified Cronin and the medical center police. On November 11, an anonymous caller telephoned the hospital, asked a nursing attendant what kind of car Cooper drove and concluded by saying to “tell [Cooper] we know where her mama lives.” On November 17,
 
 *685
 
 Cooper received an anonymous telephone call at home. This time the caller simply laughed and hung up. Neither Cooper nor the nursing attendant who received the call of November 11 was able to identify the person who made the two anonymous calls to the hospital, but Cooper “[felt] pretty comfortable saying” that it was Davis who telephoned her at home.