[No. B153530. Second Dist., Div. One. May 22, 2003.]

BRYAN HANEY, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Diane Marchant for Plaintiff and Appellant.

Rockard J. Delgadillo, City Attorney, Frederick N. Merkin and Cheryl Ward, Assistant City Attorneys, Gregory P. Orland and Matthew C. St. George, Jr., Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**SPENCER, P. J.—**

### INTRODUCTION

A Los Angeles Police Department (LAPD) Board of Rights found appellant Bryan Haney guilty of absenting himself from his duty post without authorization and submitting a daily field activities report, which he knew, or should have known, contained false information, on May 25, 1998. A majority of the three-person board recommended that appellant be removed from duty as a police officer. The chief of police accepted the recommendation and terminated appellant's employment. Appellant petitioned for administrative mandamus. The court denied his petition to compel the City of Los Angeles and its chief of police to reinstate him as a police officer. On appeal, appellant contends the charges against him are barred by the statute of limitations or, if not, the penalty of discharge denotes an abuse of administrative discretion. Inasmuch as we find no merit in appellant's contentions, we affirm the judgment.

### BACKGROUND

On Memorial Day, May 25, 1998, at appellant's suggestion, he and Officers Stephen Morris, Perry Alvarez and Toni Di Paolo celebrated with a

barbecue. Following the Harbor Division's 10:15 morning roll call, the officers purchased food for the barbecue. Officers Alvarez and Di Paolo obtained permission from security guard Ocampo to have the barbecue on the portion of the naval base in San Pedro that contained abandoned naval housing, after which they returned to the Harbor Division Police Station, obtained a grill from appellant, and drove to the naval base, arriving at approximately noon. Security guard Ocampo admitted them through a locked gate.

Officers Alvarez and Di Paolo lighted the grill and prepared the food. Appellant and Officer Morris arrived at approximately 12:30 p.m. The four officers left at approximately 2:00 p.m., leaving behind the grill, which was too hot to put in the patrol car. They did not broadcast that they were code 7, meaning they were taking a 45-minute lunch break.

All four officers had been assigned to foot patrol at morning roll call. Officers Alvarez and Di Paolo submitted a false daily field activities report at the end of their watch on May 25, 1998. The report stated that they monitored the San Pedro bicycle race from 11:00 a.m. until 2:00 p.m. Appellant and Officer Morris also submitted a false daily field activities report for that date. Their report stated that they were engaged in foot patrol activities from 11:00 a.m. to 12:30 p.m. and from 1:30 p.m. to 1:45 p.m. Their report further stated that they were code 7 from 4:30 p.m. to 5:15 p.m.

On May 27, 1998, Officer Herbert Cirilo arrived at the naval base to set up a training schedule. Security guard Sanchez reported that security guard Ocampo told him four officers held a barbecue on Memorial Day but left behind their grill. Two officers had returned on May 26 in search of the grill. Officer Cirilo gave this information to Sergeant William Forman, who held an exclusive license with the Department of Navy to use the base for training and who was the LAPD liaison to those in charge of the naval base. Sergeant Forman asked Officer Cirilo to determine whether the officers involved were attached to the LAPD.

On May 29, 1998, Officer Cirilo interviewed security guard Ocampo, who confirmed that the four officers who had the barbecue were LAPD officers. Officer Cirilo reported this to Sergeant Forman. At that point, Sergeant Forman was concerned only that a barbecue had taken place without his consent. While this would be a breach of protocol, he had no information that led him to suspect misconduct.

Sometime during the first week of June 1998, Officer Cirilo checked Harbor Division daily field activities reports for May 25 and 26, 1998. Based

on security guard Ocampo's description of the officers and Officer Cirilo's perusal of daily field activities reports, Officer Cirilo and Sergeant Forman suspected that the officers involved were appellant, Morris, Alvarez and Di Paolo. Sergeant Forman asked Officer Cirilo to prepare a written account of his investigation. Officer Cirilo did so.

The written report mentioned security guard Ocampo's statement that the officers had been on the base for two hours. Officer Cirilo's written report contains no references to the contents of the officers' May 25, 1998, daily field activities reports, however. Sergeant Forman put Officer Cirilo's report in an envelope on his desk. He intended to interview the officers believed to be involved in the barbecue. There was a question about the time frame of the barbecue, but Sergeant Forman did not know if the officers were on an extended code 7 break for which they had another supervisor's permission or had reported that they were out of service. Due to conflicting schedules and Sergeant Forman's involvement in training days, he did not speak to the officers about his concerns.

On June 29, 1998, Sergeant Forman completed a routine attendance audit for a shooting training day held in Seal Beach. The audit disclosed that Officers Alvarez and Di Paolo, who were absent from the training session due to a court appearance, signed out of court at 10:00 a.m. but did not appear thereafter for training. They did not complete a daily field activities report for that date, although they were paid for a full day's duty. At this point, Sergeant Forman became concerned that this incidence of misconduct might be indicative of a broader problem. His knowledge that Officers Alvarez and Di Paolo probably were two of the officers involved in the barbecue incident heightened Sergeant Forman's concern that a pattern of conduct was emerging that might point to misconduct connected to the barbecue. He reviewed Officer Cirilo's report and the daily field activities reports for May 25, 1998, after which he reported his concerns to Captain Robert Hansohn, who ordered a preliminary investigation. Sergeant Forman also forwarded Officer Cirilo's written report of the barbecue incident to Sergeant Debra McCarthy.

On July 1, 1998, Sergeant Daniel Contreras initiated a preliminary investigation of possible misconduct. On July 3, he interviewed security guard Ocampo, whose description of two of the four officers who held the barbecue closely matched Officers Alvarez and Di Paolo. Additional information led Sergeant Contreras to believe that appellant and Officer Morris were the other two officers who held the barbecue. He reviewed these officers' daily field activities reports for May 25, 1998. He noted that neither report reflected taking a code 7 from noon to 2:00 p.m. and neither mentioned the

barbecue. Pursuing other avenues, Sergeant Contreras determined that the officers did not have permission for an extended code 7 and did not record a deduction to be taken from paid duty for time they were out of service. He recommended that charges of misconduct be filed against these officers for abandonment of their duty posts without authorization and for submitting false daily field activities reports for May 25, 1998. He received approval on July 24, 1998, to file a personnel complaint against these four officers.

After being frustrated from doing so for several months, Sergeant Contreras finally obtained an interview with appellant on March 7, 1999. Appellant acknowledged that he abandoned his post without permission on May 25, 1998, and that he filed a daily field activities report for that date which contained inaccurate information.

Appellant was served personally on June 21, 1999 with the complaint and a relief-from-duty form that advised him of the two counts of misconduct. The department filed the charge sheet with the police commission on June 22. On the following day, in appellant's absence due to alleged illness, the chief of police selected his board of rights. The board thereafter met four times in an effort to accommodate appellant's illness. On the fourth occasion, it directed the advocates section to contact appellant's command and determine his status. The advocates section did so on November 30.

On December 9, 1999, Captain Gascon responded to the department advocate. He noted that when appellant contacted Sergeant Alex Kim on December 1, Sergeant Kim told him to provide a date when he could participate in his board of rights hearing. Appellant said he would have to contact his defense representative before doing so. Harbor Division had not heard from him since then. He had not made his required weekly contact on December 8.

Appellant's board of rights hearing convened on February 1, 2000. For the first time, appellant sent a note from his doctor stating, without explanation, that appellant could not work for 30 days. The board chair ordered the advocate to request permission from the chief of police, pursuant to section 202(8) of the city charter, to proceed with the hearing in appellant's absence. The board received permission and convened the hearing on February 2.

All of appellant's former and present supervisors considered him to be no more than an average officer. Captain Gascon, the Harbor Area commander since July 1998, considered defendant untrustworthy, as did Captain Richard Ripouli, the operations commanding officer of Harbor Division from January 1996 until March 1998. Lieutenant Debra McCarthy considered him

disloyal. None, including Captain Hansohn, appellant's commanding officer until July 1998, wanted him under their command in the future.

Captain Gascon had no personal contact with appellant but had a great deal of administrative contact with him, inasmuch as appellant had been off work, off and on, since September or October 1998, and continuously since December 1998, allegedly as a result of illness. Appellant failed to maintain contact as required by the department manual. His supervisors had such difficulty that Captain Gascon finally had to write a letter that ordered appellant to contact his supervisors once a week. Appellant still failed to maintain contact on several occasions. At one time, appellant alleged that he had called the desk, rather than the supervisors he was ordered to contact, but the individual he said he contacted was on vacation and out of town at that time and date. On another occasion, appellant said that he had contacted Captain Gascon's adjutant, who said appellant had not done so. On other occasions, when sergeants reached appellant by telephone, appellant told them that he could not talk at the moment but would return their calls immediately. He did not do so.

Lieutenant Debra McCarthy worked as a sergeant at Harbor Area, with appellant under her control, for approximately 11 months in 1997 and 1998. Lieutenant McCarthy recalled that he failed to report for work one day, after which she was unable to contact him. On the following day, appellant said that he had called in sick to the desk the day before but he could not remember to whom he spoke. After reviewing the names of those who had worked the desk, appellant said the person to whom he spoke was not on the list, so perhaps it had been someone passing by the desk. Lieutenant McCarthy and Captain Ripouli gave appellant the benefit of the doubt on that occasion but Lieutenant McCarthy thereafter became aware of several other "issues" that reflected poorly on appellant's loyalty to the department. While appellant is the type of person one can count upon to say the right thing, Lieutenant McCarthy "was never quite comfortable he did the right things."

DISCUSSION

*Limitations Period*

Appellant argues that there are three applicable limitations periods, the first contained in section 202(4) of the Los Angeles City Charter,[1] the second set forth in Government Code section 3304, subdivision (d), effective

---

[1]Section 202(4) provides that "[n]o tenured officer of the Department shall be discharged, suspended, demoted in rank, or suspended and demoted in rank for any conduct that (a) was

January 1, 1998,[2] and the third embodied in administrative order No. 7, issued by the chief of police.[3] We agree with respondents that administrative order No. 7 is nothing more than an internal departmental guideline, not in itself a limitations period or an interpretation of the law. The chief of police promulgated administrative order No. 7 as a prudent response to the uncertainty engendered by the enactment of subdivision (d) of Government Code section 3304. The order consequently plays no role in determining whether the LAPD brought charges against appellant within the applicable limitations period.

Respondents ask us to determine that the governing limitations period is that found in section 202(4) of the Los Angeles City Charter, and not that contained in Government Code section 3304, subdivision (d). Inasmuch as the department filed the charges against appellant within the limitations period stated in either provision, we need not do so.

Reviewing the evidence independently, the trial court found that Sergeant Forman did not discover misconduct until June 29, 1998. In addition, the court found, as the investigation necessarily was completed before charges were filed with the police commission on June 22, 1999, the statute of limitations had not been violated. The court also found, implicitly, that it was reasonable that Sergeant Forman did not discover misconduct earlier.

The date upon which an administrative agency discovers misconduct is a question of fact, as is the reasonable diligence with which the person authorized to initiate an investigation into misconduct acted. (Cf. *People v. Swinney* (1975) 46 Cal.App.3d 332, 344 [120 Cal.Rptr. 148].) ■ Inasmuch as these are factual questions, we must view the evidence in the light most favorable to the trial court's determination, resolving all conflicts and drawing all reasonable inferences in support thereof. (*Dresser v. Board of*

discovered by the Department and brought to the attention of the Chief of Police more than one year prior to the filing of the complaint against the officer under subsection (5) or (b) falls outside the limitations period below. Such limitations period shall have reference to the date on which the Chief files a complaint against an officer under subsection (5). . . ."

[2]Section 3304, subdivision (d), provides that "[e]xcept as provided in this subdivision and subdivision (g), no punitive action [defined as 'any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment' (Gov. Code, § 3303)] . . . shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct. . . ."

[3]Administrative order No. 7 states, in pertinent part, that "[i]nvestigations of misconduct should be completed within one year of the discovery of the misconduct by a supervisor (Sergeant I or Detective II or higher). This time limit includes the filing of the verified written complaint with the Police Commission following service upon the sworn employee."

*Medical Quality Assurance* (1982) 130 Cal.App.3d 506, 511 [181 Cal.Rptr. 797].)

In *Swinney*, on September 6, 1968, Onetia Baker discovered five state bonds missing from the safe of her friend, Winifred Maynard, who was recovering from an illness after a hospital stay. Inasmuch as Mrs. Baker did not suspect theft, but thought the bonds might have been thrown away accidentally, she did not report the loss to the police. Instead, at her friend's request, she reported the loss to the State Treasurer and inquired about reissuance. (*People v. Swinney, supra,* 46 Cal.App.3d at p. 337.)

Miss Maynard died in January 1969. In February 1969, the State Treasurer notified Mrs. Baker, who now was the executrix of Miss Maynard's estate, that the November 1968 interest coupons attached to the missing bonds had been cashed. She then asked defendant, the county treasurer, who also was a friend of Miss Maynard and who had access to Miss Maynard's house while she was hospitalized, if he knew anything about this. Defendant said he had received the interest coupons from Miss Maynard for the purpose of establishing a memorial for her deceased sister. He had cashed the coupons but did not know where the bonds were. He offered to speak to the State Treasurer about reissuance. On April 10, 1970, the State Treasurer issued replacement bonds. (*People v. Swinney, supra,* 46 Cal.App.3d at pp. 337-338.)

During the succeeding two years, defendant pledged some of the bonds as security for loans. In December 1972, more than four years after the bonds were discovered to be missing, the State Treasurer learned that a bank had three of the missing bonds. Mrs. Baker first learned of this in May 1973. On these facts, the appellate court rejected defendant's argument that the three-year statute of limitations was triggered by discovery of the bonds' disappearance in September 1968. The court instead held that "[a]t that time the owner discovered a loss of property, but not necessarily a crime." (*People v. Swinney, supra,* 46 Cal.App.3d at pp. 338-339, 344.)

Similarly, in *People v. Crossman* (1989) 210 Cal.App.3d 476 [258 Cal.Rptr. 370], Cyril O'Connor (O'Connor) liquidated a bank account so his wife could qualify for governmental medical benefits. He used the funds thus acquired to purchase gold coins. He told a neighbor, Reiny Lamm (Lamm) of the purchase and of the coins' hiding place under the stove. When O'Connor died not quite one year later, defendant was the deputy coroner assigned to investigate the death. As a consequence, defendant spent a lot of time in O'Connor's home. Approximately three months after O'Connor's death, Alonzo Real (Real) was appointed conservator of Mrs.

O'Connor's estate and commenced gathering together O'Connor's property. While Real was taking inventory in the O'Connor home one day, Lamm told Real that he suspected defendant had stolen the gold coins. (*Id.* at pp. 478-479.)

The appellate court summarized the facts known to Real as follows: "Real was told O'Connor had gold coins and he placed them under the stove in his home. Real presumably could have verified the liquidation of O'Connor's bank account and the availability of funds for the purchase [of the coins]. In addition, Mr. Lamm expressed suspicion of defendant, based on (1) the amount of time defendant spent in the O'Connor home, (2) defendant's removal of some boxes and packages, (3) the absence of a camera when defendant said he was taking pictures, and (4) the removal of decedent's metal detector from its usual resting place." (*People v. Crossman, supra,* 210 Cal.App.3d at p. 481.)

As the *Crossman* court pointed out, in reliance on *Swinney* and quoting from *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 334 [234 Cal.Rptr. 442], " 'the triggering of a period of limitations on concealed thefts requires more than mere discovery of a loss; it requires an awareness the loss occurred *by virtue of a criminal agency.* Thus, "discovery" calls for awareness of the crime, not merely the loss.' " (*People v. Crossman, supra,* 210 Cal.App.3d at p. 481, italics added by *Kronemyer.*)

Applying the foregoing precepts, the *Crossman* court held that "[a]ll that reasonably should have appeared to Real in April 1982 was that, in May 1981, Mr. O'Connor may have acquired gold coins valued at approximately $33,000 and that he may have hidden them under the stove in his home. Real found no trace of coins when he searched in July or August of 1982. He knew defendant had been in the home immediately after O'Connor's death, but aside from that fact he had nothing but speculation on which to suspect theft. The factors underlying Lamm's suspicion did not provide Real with a reasonable ground to suspect that defendant, or anyone else for that matter, had stolen any coins. Further, there was no evidence precluding the possibility that O'Connor had spent or otherwise disposed of any coins he may have had. Indeed, it was O'Connor's express purpose to conceal his assets so that his wife could qualify for government medical benefits." (*People v. Crossman, supra,* 210 Cal.App.3d at p. 482.)

On these facts, the court "fail[ed] to see, and defendant does not suggest, what inquiry Real might have made in the exercise of reasonable diligence which would have led to discovery of the crime." (*People v. Crossman, supra,* 210 Cal.App.3d at p. 482.) The court accordingly affirmed the finding that the charges of grand theft against defendant were timely.

The holdings of *Swinney* and *Crossman* apply in this case as well. On June 1 or 2, 1998, Sergeant Forman discovered a two-hour barbecue, but not necessarily misconduct.

Prior to June 29, 1998, Sergeant Forman knew four officers had violated protocol by holding a barbecue without his authorization; he did not know who, if anyone, had authorized the event. There was a question about the time frame of the barbecue but he did not know whether the officers were on an extended code 7 break or had reported that they were out of service. Sergeant Forman intended to interview the officers but, due to the press of his training schedule and conflicting work schedules, he did not have the opportunity to do so before the last week of June 1998, after he conducted the training day audit, approximately one month after the barbecue. It was not until the last week in June, when he discovered training day misconduct by two of the four officers, that he suspected there might be a pattern of misconduct that included the barbecue incident. He reviewed Officer Cirilo's report and the daily field activities reports for May 25, 1998. He passed on all the information he had acquired to his captain on June 29, 1998.

The matter was referred to Sergeant Contreras, the four officers' patrol supervisor. He initiated an investigation on July 1, 1998. Initially, Sergeant Contreras considered the possibility that the officers might have a defense, "that perhaps they had an extended Code 7 with permission of the watch commander or put in a deduct that they were out of service. . . . Later on I inquired and that hadn't been done."

Applying the standard of review, we must affirm. This is an instance where reasonable minds could differ on the question of whether Sergeant Forman should have suspected misconduct any earlier than June 29, 1998. We therefore must defer to the trial court's determination of that point.

*Abuse of Discretion in Imposing Discharge as a Penalty*

In a mandamus proceeding, we conduct a de novo review concerning possible abuse of discretion by the administrative agency. (*Talmo v. Civil Service Com.* (1991) 231 Cal.App.3d 210, 226-228 [282 Cal.Rptr. 240].) We may disturb the penalty the agency imposed only if it is clear that the agency abused its discretion. (*Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306]; *Cummings v. Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652 [47 Cal.Rptr.2d 775].) As our Supreme Court has noted, "the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.]" (*Skelly v. State Personnel Bd.*

(1975) 15 Cal.3d 194, 218 [124 Cal.Rptr. 14, 539 P.2d 774].) Appellant characterizes his misconduct as nothing more than an isolated event that did not harm the public service. That characterization is disingenuous.

■ With premeditation, appellant proposed that he and fellow officers hold a Memorial Day barbecue while they were on duty. Appellant and his fellow officers planned the barbecue, purchased food for it and attended it, performing all of these acts during duty hours when they should have been performing their foot patrol assignments. Appellant then knowingly falsified an official LAPD document, the daily field activities report, to conceal the time spent at the barbecue and appellant's defalcation of duty.

These acts indisputably caused " '[h]arm to the public service.' " (*Skelly v. State Personnel Bd., supra*, 15 Cal.3d at p. 218.) Appellant deprived the public of police protection by his absence, and the absences of his fellow officers, from patrol duties. He demonstrated both disloyalty to the LAPD and a serious lack of integrity. That lack of integrity takes two forms. It is apparent in the outright lies written in his daily field activities report, chronicling patrol activity during some of the time consumed by the barbecue and later taking a code 7 lunch break. It is equally apparent in the instances where appellant showed duplicity in discussing his purported illness and his duty status and in dealing with the LAPD's reporting requirements. It is so significant that none of his former supervisors would trust him in the future. If forced to retain him, they would assign him only to in-station duty or would place him on patrol only under very close supervision.

Police officer integrity is vital to effective law enforcement. Public trust and confidence in the department as an institution and in individual officers do not exist otherwise. Appellant consequently harmed the public by depriving the public of police protection for a significant period and, through his dishonesty and lack of integrity, diminished public trust and confidence. In these circumstances, the department clearly did not abuse its discretion in discharging appellant.

The judgment is affirmed.

Mallano, J., concurred. Vogel (Miriam A.), J., concurred in the judgment only.