[No. C022467. Third Dist. Nov. 13, 1997.]

DEPARTMENT OF CORRECTIONS, Plaintiff and Respondent, v.
STATE PERSONNEL BOARD, Defendant;
JOHNNY C. WALLACE, Real Party in Interest and Appellant.

**COUNSEL**

Loren E. McMaster for Real Party in Interest and Appellant.

Melissa M. Meith and John P. Winn for Plaintiff and Respondent.

**OPINION**

PUGLIA, P. J.—Real party in interest Johnny C. Wallace (Wallace) was dismissed from his position as a correctional sergeant with plaintiff California Department of Corrections (CDC or Department) following an incident at Deuel Vocational Institution (DVI) involving himself and another correctional officer, G. Picone (Picone). In a private conversation between Wallace and Picone, Wallace, a White male, complained to Picone, a Hispanic female, about preferential treatment bestowed on Hispanic employees by CDC, used profane language, and shook Picone by the collar to emphasize his point.

Wallace appealed his dismissal to defendant State Personnel Board (Board). The Board concluded Wallace's termination was based in part on protected First Amendment speech and reduced the discipline to a 30-day suspension.

CDC petitioned the superior court for a writ of administrative mandamus (Code Civ. Proc., § 1094.5) to overturn the Board's decision reducing the dismissal to a suspension. The superior court concluded the Board erred in finding any part of Wallace's conduct protected by the First Amendment. The court granted the writ and directed the Board to set aside its decision and to reconsider the appropriate punishment. Wallace appeals. We shall reverse.

## I

The facts, essentially undisputed, are stated in the decision of the Board. "[Picone] is a female Hispanic Correctional Officer who has worked at [DVI] for seven years. In 1990, she took the Sergeant's examination, placed 800th on the list, and was not reachable on a permanent basis. She was nonetheless appointed as a limited-term Sergeant in January 1991 as part of the Department's Affirmative Action efforts. . . . After completing a year as a limited-term Sergeant, [Picone] received a second one-year appointment. This created some resentment among other employees who felt that others on the Sergeant's list should be given a chance at the position. . . .

"Additional resentment was created when [Picone] was appointed to the Investigative Gang Sergeant position. This is a prestigious second watch position which is highly coveted by other Sergeants. . . .

"[Wallace] was one of the Sergeants who was resentful about [Picone's] selection as Gang Sergeant. He had been attempting to get a second watch position for some time so that he could spend more time with his 13-year-old son. [Wallace] did not have high enough seniority to be able to obtain a second watch position by seniority, yet many junior Sergeants who were Hispanic had second watch positions. When [Wallace] inquired about this, he was told that the Department wanted to have minority females in the second watch positions to increase their 'visibility' and to demonstrate the institution's commitment to Affirmative Action. . . .

"During 1992, the Department gave another Sergeant's examination. [Picone] did not take this examination, but others at the institution did and scored higher than [Picone] had scored on the first examination. When the two lists were merged, [Picone] was again not reachable for a permanent appointment. In January 1993, her second limited-term appointment expired, and she had to revert back to her Correctional Officer position. [Picone] did not blame the Department for this action but blamed herself for not taking the second Sergeant's examination. However, some employees expressed the view that [Picone] had been 'shafted' and felt that she should have been promoted on a permanent basis. Other employees, including [Wallace], did not agree and felt that [Picone] had been given undeserved preferential treatment in the first place because of her race [*sic*] and sex. This was a common topic of conversation among officers during this period . . . .

"During one of these passing conversations, some officers expressed their opinion to [Wallace] that [Picone] had been 'shafted.' [Wallace] disagreed, stating his view that [Picone] was a 'lop' (prison slang for a poor performer)

and did not deserve to wear the stripes in the first place. [Wallace's] comments got back to [Picone] who was understandably hurt by them as she thought she had a good relationship with [Wallace]. . . .

"On February 12, 1993, [Picone], who was going off duty, approached [Wallace] during shift change and told him that she wanted to talk to him privately about something. [Wallace], who was just starting his shift, followed [Picone] out to the north corridor where no other staff or inmates were present. . . . [Picone] told [Wallace] that she had heard that he was talking bad about her and that she wanted it to stop.

"[Wallace] was very frustrated about his own situation of not being able to get a second watch position to spend more time with his son. He was also tired of hearing officers saying that [Picone] had been 'shafted' . . . . He lost his temper, slapped the wall with his hand, and said to [Picone] in a low voice, 'I am tired of this Hispanic shit; us white guys are tired of being looked over.' He stated that he was 'sick and tired about hearing about poor fucking [Picone] getting shafted.' [Wallace] was irate, clenching his teeth, and talking in a very low, irritated voice. . . .

"[Picone] was stunned by [Wallace's] reaction. She told him that he needed to stop talking like that because it was going to get him in trouble. She told [Wallace] that she could understand how he felt because she was married to a white officer who worked for the sheriff's department. She agreed that it was not always fair but that minorities had gone through a lot. She said she could understand why he felt that way, but he was handling it all wrong. [Picone] started crying. [Wallace] had tears in his eyes and seemed to be out of control. He grabbed [Picone's] shirt lapel and started shaking her saying, 'Do you understand what I'm saying? Do you understand what I'm feeling? We're sick and tired of it.' After a few seconds, [Wallace] let go of her lapels. . . .

"[Picone] was still crying. . . . She asked [Wallace] to escort her out of the institution so that the inmates and other staff would not see her crying. [Wallace] and [Picone] walked out of the institution with [Wallace] shielding [Picone] from the inmates and other staff. . . . [Wallace] was calmer now. He told [Picone] that it was her fault that she had not taken the second sergeant's examination and scored higher and that he was tired of everyone saying 'poor [Picone].' [Wallace] told [Picone] that she had made her own choices and could have transferred out. [Picone] told [Wallace], 'John, I'm not asking for sympathy. I'm trying to lie low and do my job. I can't help how others feel.' . . .

"Later that evening, [Wallace] had the Control Sergeant telephone [Picone] at home to see if she would be willing to talk to him. . . . [Picone]

agreed to talk to [Wallace], and the call was transferred. [Wallace] said, 'What we talked about, you were right; but I am still entitled to my own opinion.' [Picone] laughed and said, 'Is that an apology?' The conversation was then terminated. . . .

"Following the incident with [Wallace], [Picone] asked for a job change. When the job change was denied, she decided that she wanted to transfer from the institution. She subsequently received a transfer to the Northern California Women's Facility . . . . She testified that she would have reservations about working for [Wallace] as a sergeant because of his statements to her. She felt that those statements expressed hatred towards her because of her race [sic]. [Picone] never filed a discrimination complaint about [Wallace's] conduct with the Department but did file a complaint with the Department of Fair Employment and Housing."

Wallace was charged with inefficiency, inexcusable neglect, intemperance, discourteous treatment of another employee, willful disobedience, unlawful discrimination, and other failure of good behavior bringing discredit to the institution. The Board concluded "the content of [Wallace's] remarks to [Picone] was constitutionally protected, but the manner in which he delivered these remarks was not." The Board sustained only the charges of discourteous treatment of another employee (Gov. Code, § 19572, subd. (m)) and failure of good behavior bringing discredit to the Department (Gov. Code, § 19572, subd. (t)).

The trial court disagreed with the Board's First Amendment analysis. The court determined the Board failed to accord appropriate weight to several "uncontested" facts, to wit: (1) Wallace was superior to Picone and was "in a position to hamper her career"; (2) Picone had gone to Wallace to discuss his reference to her as a "lop"; (3) the comments occurred at the workplace; and (4) Picone was "severely impacted, emotionally." According to the court, the Board's analysis is "shocking" and "has the potential of signaling to all disgruntled state workers an 'open season' on minority subordinates, to unleash venomous epithets under the guise of protected speech." The court further concluded Wallace's conduct "created a hostile or abusive work environment and constitutes unlawful discrimination."

II

The discipline imposed on a public employee may not infringe constitutionally protected free speech. (*Rankin* v. *McPherson* (1987) 483 U.S. 378, 383 [107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324].) This does not mean public employees have an unlimited right to express themselves in the

workplace as they see fit. The determination whether a public employee has been properly disciplined for speech related activities requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 568 [88 S.Ct. 1731, 1734-1735, 20 L.Ed.2d 811, 817].) The proper balance to be struck is a question of law for the court. (*Connick* v. *Myers* (1983) 461 U.S. 138, 148, fn. 7 [103 S.Ct. 1684, 1690, 75 L.Ed.2d 708, 720].)

At the threshold, the inquiry is whether the speech which invites the discipline may fairly be characterized as involving a matter of public concern. (*Connick* v. *Myers, supra,* 461 U.S. at p. 146 [103 S.Ct. at pp. 1689-1690, 75 L.Ed.2d at p. 719].) This must be determined "by the content, form, and context of a given statement, as revealed by the whole record." (*Id.* at pp. 147-148 [103 S.Ct. at p. 1690, 75 L.Ed.2d at p. 720].)

■ CDC contends Wallace's statements to Picone involve only a personal grievance, not a matter of public concern. In *Connick* v. *Myers, supra,* 461 U.S. 138 [103 S.Ct. 1684, 75 L.Ed.2d 708], the high court concluded a deputy district attorney's distribution of a questionnaire to fellow employees focusing on certain concerns in the operation of the district attorney's office was primarily an offshoot of a personal grievance between the deputy and the office and, to that extent, not a matter of public concern. The deputy, Myers, had been informed she would be transferred within the office and her objections to the move were ignored. The court explained: "We view the questions [in the questionnaire] pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section . . . . [W]e do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." (461 U.S. at p. 148 [103 S.Ct. at pp. 1690-1691, 75 L.Ed.2d at pp. 720-721].)

Although the *Connick* court found much in the questionnaire that was not of public concern, a question regarding whether pressure was being exerted on deputies to work on political campaigns was treated differently: "[T]he

issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." (*Id.* at p. 149 [103 S.Ct. at p. 1691, 75 L.Ed.2d at pp. 721-722].)

The evidence discloses that conversations regarding the relative merits of affirmative action "go on all the time" among CDC employees. The fairness or inequity of affirmative action is not an issue unique to CDC. Wallace's concerns mirror those of many others in public employment. The discussion between Wallace and Picone could have taken place in virtually any public agency.

Few issues today stimulate as much debate or are as divisive as affirmative action, particularly the kind that calls for women and certain racial and ethnic minorities to be given preference in employment over White (non-Hispanic) males. (See Hudgins, *Rethinking Affirmative Action in the 1990's: Tailoring the Cure to Remedy the Disease* (1995) 47 Baylor L.Rev. 815, 816; Sullivan, *Sins of Discrimination: Last Term's Affirmative Action Cases* (1986) 100 Harv. L.Rev. 78; Pilon, *Discrimination, Affirmative Action, and Freedom: Sorting Out the Issues* (1996) 45 Am. U. L.Rev. 775.) Disputes over affirmative action generate a significant amount of litigation. Some of those cases have achieved national notoriety and have further fueled the public debate. (See, e.g., *Adarand Constructors, Inc.* v. *Pena* (1995) 515 U.S. 200 [115 S.Ct. 2097, 132 L.Ed.2d 158] [equal protection mandates that federal government's use of race and ethnic based classifications to favor minority contractors bidding on federal projects be analyzed under strict scrutiny standard]; *City of Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [109 S.Ct. 706, 102 L.Ed.2d 854] [city ordinance setting aside 30 percent of city construction contracts for racial and ethnic minority contractors violates equal protection where city failed to show that favored racial and ethnic classes had suffered past discrimination in the construction industry]; *Johnson* v. *Transportation Agency* (1987) 480 U.S. 616 [107 S.Ct. 1442, 94 L.Ed.2d 615] [promotion of qualified female applicant over better qualified male applicant does not violate the latter's right under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) to nondiscriminatory treatment where, even though the sex of the female applicant was the determining factor in the promotional decision, the promotion was made in furtherance of an affirmative action plan designed to eliminate an imbalance between the sexes in the employer's workforce caused by societal discrimination]; *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750] [a public university may consider the race or ethnicity of an applicant for admission as one factor to be weighed against all others in the admissions process].)

The competing views are well known. Proponents argue preferential treatment is justified because of historic societal discrimination against women and certain minorities. Opponents contend preferential treatment unfairly discriminates against nonpreferred individuals, i.e., White (non-Hispanic) males, who are penalized for past societal discrimination for which they are not responsible. (438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750]; Carlson, *Adarand Constructors, Inc.* v. *Pena: The Lochnerization of Affirmative Action* (1996) 27 St. Mary's L.J. 423, 424-425, fn. 2; Kennedy, *Persuasion and Distrust: A Comment on the Affirmative Action Debate* (1986) 99 Harv. L.Rev. 1327, 1327-1328.) After decades of debate and litigation, there is still no public consensus on this very polarizing issue. Preferential treatment based on inherent, immutable personal characteristics remains a particularly volatile political issue of transcendent public concern. (Strauss, *Affirmative Action and the Public Interest* (1995) 1995 Sup. Ct. Rev. 1, 42.)

Both Wallace and Picone had more than a casual interest in CDC's affirmative action policies, Wallace because of his race and sex, and Picone because of her ethnicity and sex. Because of these personal characteristics, Wallace was disadvantaged and Picone was benefited by CDC's affirmative action policy.

As a department of state government, CDC is required to engage in affirmative action. Government Code section 19790 provides in relevant part: "Each agency and department is responsible for establishing an effective affirmative action program. The State Personnel Board shall be responsible for providing statewide advocacy, coordination, enforcement, and monitoring of these programs. Each agency and department shall establish goals and timetables designed to overcome any identified underutilization of minorities and women in their respective organizations. . . ."

Government Code section 19797 provides: "Each state agency and department shall develop, update annually, and implement an affirmative action plan which shall at least identify the areas of underutilization of minorities and women within each department by job category and level, contain an equal employment opportunity analysis of all job categories and levels within the hiring jurisdiction, and include an explanation and specific actions for improving the representation of minorities and women."

The Board has promulgated regulations governing the conduct of affirmative action in the classified service. (See Gov. Code, §§ 18701; 19792, subd. (b).) Section 547.30 of title 2, California Code of Regulations provides: "The objective of this article is to establish procedures to facilitate the board exercising its authority under the State Constitution and the State Civil

Service Act to provide equal employment opportunity in the state civil service, to assure that hiring and promotion conforms to the Federal Civil Rights Act of 1964, and to eliminate and rectify present effects of past discriminatory employment practices through facilitating use of affirmative action programs and issuing remedial orders. [¶] The following process shall be adhered to in instituting remedial actions: [¶] (a) Identification of classes, occupations, departments and/or program areas in which there is substantial underutilization of minorities, women, or the disabled in the state civil service. [¶] (b) Determination of whether or not past discriminatory employment practices have contributed to the substantial underutilization. [¶] (c) Issuance of remedial orders to assist in correcting the substantial underutilization."

Minorities are defined as "members of a race or ethnicity for whom hiring goals are set in the state's affirmative action planning process, as listed in the State Personnel Board's Annual Affirmative Action Report for the 1980-81 Fiscal Year." (Tit. 2, Cal. Code Regs., § 547.31, subd. (d).)

Minority groups specifically targeted for affirmative action are identified as: Blacks, Hispanics, Asians, Filipinos, American Indians and the disabled. In addition, females are identified as an affirmative action target group. (Annual Affirmative Action Rep. of the State Personnel Bd., 1980-1981 Fiscal Year, p. 4.)

The only distinctive classifications by race and sex which are not targeted for affirmative action are White males who are neither Hispanic nor disabled. It is this minority upon which the state imposes the entire burden of rectifying past societal discrimination. Members of this minority, like Wallace, who are affirmatively and repeatedly shunted to the bottom of the lists for hiring and promotion are thought to have no reason to complain because others of their race and sex have benefited disproportionately from the pre-affirmative action regime under which employment opportunities previously were allocated. According to this theory, any unhappiness Wallace might feel from being repeatedly denied a more desirable shift, even while similar requests by less senior members of "targeted groups" were granted, should be more than assuaged by the knowledge that, over time, other White males have benefited disproportionately from preexisting societal practices, traditions and arrangements by which employment opportunities were allocated. Thus, so the theory goes, Wallace's splenetic outburst at Picone concerning preferential treatment of minorities is the more egregious because he lacked any legitimate grounds for complaint.

It is, of course, counterintuitive to suppose that one's individual life and career aspirations can be fulfilled or realized vicariously through the

achievements of others simply because they are of the same race and sex. Whatever satisfaction that might give, it does not put food on the table, educate one's family or, as in this case, enhance a father's relationship with his child. Thus it is not at all surprising that Wallace resented the role assigned by the state to his race and sex. As expressly found by the Board, Wallace was clearly frustrated by CDC's policy of preferential treatment of women and specified racial and ethnic minorities. For some time he had coveted a second watch position but did not have the necessary seniority. Yet many Hispanic sergeants who were junior to him had obtained second watch positions. Picone had less seniority than Wallace and had not scored high enough to earn a permanent promotion to sergeant but was given a temporary assignment on second watch. Wallace had heard others at DVI complain that Picone had been treated unfairly in being denied a promotion to sergeant on a permanent basis. Wallace did not think Picone had been mistreated. On the contrary, he believed Picone had been given preferential treatment under CDC's affirmative action policies. When Picone initiated a discussion with Wallace to request that he stop making negative comments about her, Wallace used the opportunity to vent his frustration and anger over CDC's policy of preferential treatment.

Nevertheless, the fact Wallace had been personally disadvantaged by the policy does not alter the fact preferential treatment in public employment on the basis of race, sex, ethnicity or national origin is not only a basis for personal grievance but, transcendentally, a matter of intense public concern. (*Chico Police Officers' Assn.* v. *City of Chico* (1991) 232 Cal.App.3d 635, 648 [283 Cal.Rptr. 610]; *Rode* v. *Dellarciprete* (3d Cir. 1988) 845 F.2d 1195, 1202.)

It cannot be gainsaid the discussion between Wallace and Picone which gave rise to this personnel action involved a matter of public concern. Preferential treatment in public employment based on race, sex, ethnicity or national origin is a matter of concern not only to those directly affected, i.e., public employees who benefit or are disadvantaged by it, but also to the public generally in whose name and under whose auspices these controversial policies are carried out.[1]

■ CDC contends Wallace's statements to Picone, even if involving a matter of public concern, are excepted from First Amendment protection as

---

[1] So much so that at the November 1996 General Election, the voters approved Proposition 209, which adds to the California Constitution a provision prohibiting the state from discriminating against or granting preferential treatment to any individual or group on the basis of race, sex, color, ethnicity or national origin in the operation of public employment, public education or public contracting.

"fighting words." Over half a century ago, the United States Supreme Court explained the concept of "fighting words" in a passage parts of which now seem quaintly Victorian: "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' [Citation.]" (*Chaplinsky* v. *New Hampshire* (1941) 315 U.S. 568, 571-572 [62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035], fns. omitted.)

In *In re John V.* (1985) 167 Cal.App.3d 761 [213 Cal.Rptr. 503], the juvenile court sustained a petition (Welf. & Inst. Code, § 602) alleging that the 16-year-old minor had violated Penal Code section 415 by screaming at his neighbor, "fucking bitch," as he drove past her house. Penal Code section 415 prohibits the use of "offensive words in a public place which are inherently likely to provoke an immediate violent reaction." The minor had been screaming such epithets at his neighbor for several years and on one occasion his neighbor, provoked by his vilification, had attempted to hit him with a baseball bat. The Court of Appeal found the minor's words unprotected by the First Amendment, explaining: "Unless we are prepared to reject the 'fighting words' exception to the First Amendment we must accept the premise that there are certain words in our society which when directly communicated to a person under certain circumstances will in fact provoke an immediate violent reaction. As infrequent as that situation may be we are satisfied it occurred in the case before us. We are hard pressed to think of a more volatile situation than the one here when [the minor] decided to provoke [his neighbor] once again by calling her a 'fucking bitch.' " (167 Cal.App.3d at p. 769.)

Although the *John V.* court was "hard pressed" to think of a more volatile situation than presented there, CDC is not so vexed. According to CDC's brief, ". . . the circumstances that existed in the instant case are much more volatile than those described in [*John V.*]. The pending matter involved a *prolonged verbal attack* in which the *weapons* deployed by [Wallace] were just those words proscribed by the Fourth District Court of Appeal [in *John*

*V.*]. [Wallace's] *verbal assault* was initially coupled with a *violent blow* to the wall behind [Picone]. [¶] The *verbal attack* was later combined with a *physical attack*. This particular conduct is not simply *reprehensible*, it is *criminal*." (Italics added.)

Contrary to CDC's frenetic, hyperbolic description of the encounter, there is no support in the record for the application of the fighting words exception. There was no "prolonged verbal assault," as CDC contends. The entire incident lasted only a few minutes and Wallace's statements, while addressed to Picone, were not critical of her personally or of her conduct. They were directed at CDC and its policy of preferential treatment of women and minorities to the detriment of Wallace and other White males. There was no "violent blow" to the wall; Wallace "slapped" the wall. Although Wallace did grab Picone's shirt collar and shake her for a few seconds to emphasize his frustration, this cannot reasonably be interpreted as an attempt to harm her physically, as the word "attack" would suggest.[2] Finally, viewed as a whole, the incident never remotely threatened to erupt in violence, a necessary criterion for application of the fighting words exception. (See *Jefferson* v. *Superior Court* (1975) 51 Cal.App.3d 721, 725 [124 Cal.Rptr. 507].)

■ We next consider the proper balance between Wallace's interest in free expression and CDC's interest in promoting harmony and efficiency in the workplace. Before doing so, however, we resolve a conceptual disagreement between the Board and the trial court over what may be considered in this analysis.

The Board concluded Wallace cannot be punished for the content of his statements to Picone but only for the way in which they were delivered, i.e., the conduct accompanying his statements including the use of profane language. In other words, while Wallace may be punished for the incident in

---

[2]CDC argues the "weapons" used by Wallace were the same as proscribed by the *John V.* court. Presumably, CDC refers to use of the word "fuck." However, as the *John V.* court explained: "We understand 'fuck' is now a ubiquitous term frequently heard in movies or songs or overheard in essentially every social environment. We are also aware *Cohen* explained 'the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric.' (*Cohen* v. *California* [(1971) 403 U.S. [15,] 25 [29 L.Ed.2d [284,] 294].) But our concern is not with improving the auditory ambiance of the community by excising certain words which some may think are offensive." (167 Cal.App.3d at p. 769.) Clearly, the *John V.* court was not concerned with the word used but with the manner in which it was used. What we have said concerning the word "fuck" applies, a fortiori, to the word "shit."

CDC argues Wallace's conduct was "criminal." While it is true that even the slightest touching can constitute a technical battery under Penal Code section 242 (*People* v. *Rocha* (1971) 3 Cal.3d 893, 899, fn. 12 [92 Cal.Rptr. 172, 479 P.2d 372].), the resort to that discription in this factual context strikes us as overwrought. The best evidence of this is that Picone has not accused Wallace of assault.

general, he may not be penalized for the fact his statements were critical of CDC's policy of preferential treatment of women and minorities or Picone's views on the subject.

The trial court, on the other hand, concluded the content of Wallace's statements cannot be separated from the manner in which they were delivered or the accompanying conduct. The court acknowledged that "in a proper setting" and "at the proper time" Wallace's statements might be considered protected speech. However, in the court's view, the Constitution affords no protection under the circumstances presented here.

Predictably, Wallace advocates the approach of the Board while CDC aligns itself with the trial court's approach. CDC cites two decisions which it contends support the analysis of the trial court. In *Waters* v. *Churchill* (1994) 511 U.S. 661 [114 S.Ct. 1878, 128 L.Ed.2d 686], a public hospital fired Churchill, a nurse, because of a conversation she had with another nurse criticizing the hospital's cross-training and staffing policies and discouraging the other from accepting a transfer to Churchill's department. The issue in *Waters* was whether the hospital could base Churchill's termination on what she actually said or on what it reasonably believed she said. The court concluded the latter. In dictum, the plurality indicated Churchill's speech, as understood by the employer, was unprotected inasmuch as "the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had. . . . Churchill's speech may have substantially dampened [the other's] interest in working in obstetrics. Discouraging people from coming to work for a department certainly qualifies as disruption." (511 U.S. at pp. 680-681 [114 S.Ct. at p. 1890, 128 L.Ed.2d at p. 702-703].)

In *Gray* v. *County of Tulare* (1995) 32 Cal.App.4th 1079 [38 Cal.Rptr.2d 317], a captain in the sheriff's department was terminated for, among other things, publicly charging the newly elected sheriff with misusing county resources and the prerogatives of his office to reward supporters and punish opponents. The captain's statements were reported in a local newspaper. The Court of Appeal concluded the captain was properly disciplined because his interest in making the statements was outweighed by the sheriff's interest in maintaining order and discipline in the department. (*Id.*, at p. 1096.) The court considered as persuasive the nature of the statements made, the fact they appeared in a public medium, and in the context of an ongoing dispute within the department. According to the court, the reported statements "contributed significantly to a public debate about discord within the Department which fostered dissension and impaired [the sheriff's] ability to manage." (*Id.* at p. 1094.)

Neither *Waters* nor *Gray* supports the analysis of the trial court. In both, the court balanced the right of the employee to make the statements against the disruptiveness to the employer of those statements. In other words, the measure of the negative impact on the employer was the message, rather than the way in which it was delivered or any surrounding conduct. The method of delivery was relevant only in assessing the full extent of the disruptiveness. A damaging statement made quietly to a single individual might normally be expected to cause less disruption than one made over a loudspeaker to a multitude.

In *Rankin* v. *McPherson*, *supra*, 483 U.S. at page 388 [107 S.Ct. at page 2899, 97 L.Ed.2d at page 327], the court stated: "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. [Citations.]" However, in that case, as in *Waters* and *Gray*, it was the content of the employee's statement which made it damaging to the employer. A clerical employee in a constable's office had overheard a radio dispatch regarding an attempt on the President's life and commented privately to her boyfriend, a co-employee, that " 'if they go for him again, I hope they get him.' " (*Id.* at p. 381 [107 S.Ct. at p. 2895, 97 L.Ed.2d at p. 322].) Considering the statement in context, and under all the circumstances, the court concluded the employee's interest in making the obviously political statement outweighed any harm to the constable. (*Id.* at pp. 389-392 [107 S.Ct. at pp. 2899-2901, 97 L.Ed.2d at pp. 327-329].)

None of the foregoing cases prohibits consideration of the content of a public employee's statements in isolation from accompanying, offensive conduct. The content of the speech may itself be objectionable and cause harm to the employer, as in the foregoing cases. However, separate and distinct harm may come, as here, from the employee's use of objectionable language or from his accompanying conduct.

The trial court indicated that in assessing whether Wallace's statements are protected by the First Amendment, they must be viewed in context. We agree. The context gives meaning to Wallace's statements and demonstrates their protected nature. Wallace's comment he is tired of this "Hispanic shit," without more, could hardly be considered protected. However, in context it obviously referred to CDC's policy of preferential treatment for Hispanic employees to the detriment of White males such as Wallace. This is not to say protected statements cannot be viewed in isolation from the conduct accompanying them. One who proclaims a moral objection to abortion, clearly a matter of public concern, while throwing a bucket of blood on an

abortion center should expect to be prosecuted for vandalism, but not for the statements made.[3]

The Board concluded Wallace was properly punished for the conduct accompanying his statements and for his use of profane language. This is not in dispute. What is in dispute is whether Wallace may be punished as well for critical comments to a subordinate, minority employee at the workplace concerning CDC's preferential treatment policy. As previously explained, this turns on the respective weights of Wallace's interest in speaking out on a subject of public concern and CDC's interest in maintaining harmony and order in the workplace. In striking this balance, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 384 [107 S.Ct. at p. 2897, 97 L.Ed.2d at p. 324].)

Neither CDC nor the trial court attributes any harm, actual or potential, to CDC from Wallace's critical comments to Picone about the Department's preferential treatment policies. The statements were made in private and there is no evidence they were overheard by strangers to the conversation. The fact Wallace, a White male, objected to these policies did not come as a surprise to Picone. She told Wallace she understood how he felt because she was married to a White male peace officer. Although CDC argues Wallace's statements about favorable treatment for Hispanics "most likely engendered disharmony among employees at DVI," there is no evidence of this in the record. What there is evidence of is that CDC's preferential treatment policies benefitting Picone and Hispanics generally provoked disharmony among employees within the Department. Wallace's outburst was merely a manifestation of this preexisting disharmony.[4]

 The trial court concluded Wallace's conduct toward Picone "created a hostile or abusive work environment and constitutes unlawful discrimination." That conclusion lacks any support in the record. The incident in

---

[3]In urging that content cannot be viewed in isolation from accompanying conduct, the dissent blurs the distinction between conduct and context. As indicated, the content of particular speech must be viewed in the context of its delivery. In this matter, context would include the fact Wallace's statements were made in the workplace, were made to a coworker who was in a more junior position, and followed Picone's completion of a two-year assignment to a position for which, but for affirmative action, she was not eligible. Context would also include the fact Wallace had experienced years of frustration over his inability to obtain a second shift position to which less-senior minorities had been assigned.

[4]There is no evidence of actual or potential harm to Picone either. Although Picone ultimately transferred out of DVI, the record does not disclose whether this transfer was detrimental to her economically or otherwise. Picone herself testified she sought a transfer to

question was initiated by Picone and lasted only a few minutes, followed later that evening by a brief telephone conversation which Picone did not consider harassing. The incident was between coworkers, although Wallace was a higher level employee at the time. Picone selected both the time and the place of the encounter. Except for the fact Picone is Hispanic, there is nothing in Wallace's statements which would suggest they were an attack on her personally rather than on CDC's affirmative action policies. Other witnesses testified Wallace never displayed any signs of racial or ethnic animus or hostility toward women. Picone understood how Wallace felt regarding affirmative action but nevertheless adhered to her position that minorities deserve preferential treatment.[5]

The case cited by the trial court to support its conclusion, *Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17 [114 S.Ct. 367, 126 L.Ed.2d 295], is inapposite. There, a female employee was repeatedly made the target of sexual insults and innuendoes by the company's male president. Although the president promised to stop after the employee complained, he failed to do so and the employee quit. She sued under title VII of the Civil Rights Act of 1964 and the Supreme Court concluded a viable claim was stated regardless of whether the conduct seriously affected the employee's psychological well-being.

*Harris* involved persistent misconduct by the company president which continued after the employee complained. Here, there was a single, brief incident by a coworker, albeit one at a higher level within the prison hierarchy. In *Harris*, the misconduct of the company president was misconduct by the employer itself. Here, the misconduct of Wallace was not misconduct by the employer. On the contrary, Wallace was disciplined by the employer for his actions.

■ "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning

get away from the racism that was getting worse "throughout the institution," and not simply because of the incident with Wallace. A concern with or objection to a policy of preferential treatment for minorities does not equate with racism.

Picone filed a complaint with the Department of Fair Employment and Housing, but the nature of that complaint, i.e., whether based on the content of Wallace's statements or the accompanying conduct, is not revealed. CDC contends it was required to conduct a "fairly extensive investigation" in response to Picone's complaint. However, there is nothing in the record regarding this purported investigation.

[5]The dissent suggests the record shows Wallace resented Hispanic officers' receipt of preferential treatment. This is true. However, the dissent carries this one step further to suggest Wallace resented Picone because she received preferential treatment. This is not supported by the record. One may resent another's receipt of preferential treatment without resenting the individual. There is no evidence Wallace blamed Picone or other minorities for his troubles. On the contrary, Wallace never displayed signs of racial or ethnic animus or hostility toward minorities or women.

of Title VII. [Citation.]" (*Meritor Savings Bank* v. *Vinson* (1986) 477 U.S. 57, 67 [106 S.Ct. 2399, 2405, 91 L.Ed.2d 49].) For harassment to be actionable, ". . . it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' [Citation.]" (*Ibid.*) ██ No such severe or pervasive harassment is evident here.

In our view, the Board struck the proper balance between the interests of Wallace in expressing his disagreement with CDC's preferential treatment policies and the interests of CDC in suppressing such dissent. The Board reasonably concluded Wallace's statements, in the context of their delivery, were protected by the First Amendment and refused to consider them in assessing punishment. Based solely on Wallace's conduct accompanying his statements, including the use of profane language and grabbing Picone by the collar and shaking her, the Board concluded a 30-day suspension was an appropriate punishment. We agree.

██ "Generally speaking, '[i]n a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.' [Citations.]" (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774].) "In considering whether such abuse occurred in the context of public employee discipline, . . . the overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' . . . Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Id.* at p. 218, citations omitted.) "In weighing these factors, we may consider the nature of the profession in issue, since some occupations such as law enforcement, carry responsibilities and limitations on personal freedom not imposed on those in other fields. [Citation.]" (*Thompson* v. *State Personnel Bd.* (1988) 201 Cal.App.3d 423, 429 [247 Cal.Rptr. 210].)

██ The Board cited a number of factors supporting its reduction of the discipline from dismissal to a 30-day suspension. Wallace had an excellent work record free of discipline since he first began working for CDC in 1981. His work record contains numerous "outstanding" performance evaluations and commendations. By "universal acclaim," Wallace is a "tireless" worker and one of the best sergeants at DVI. Other mitigating circumstances cited by the Board include Wallace's years of frustration over being unable to obtain a second watch position to spend more time with his son, and his voluntary enrollment after the incident in a program to learn how better to control his emotions and deal with people. To these, we would add the fact

that CDC's legally sanctioned discrimination against Wallace because of his race and sex is a burden that only the most saintly could reasonably be expected to bear with enduring equanimity.

The trial court indicated the Board failed to give adequate consideration to the fact Wallace was a superior officer, Picone had gone to Wallace to discuss his referring to her as a "lop," the incident occurred at the workplace, and Picone was "severely impacted, emotionally." However, all of these matters were mentioned by the Board in its opinion and there is no reason to believe they were not given due consideration.

Based on all the circumstances, but excluding any consideration of the content of Wallace's protected statements to Picone, the Board did not abuse its discretion in reducing Wallace's punishment to a 30-day suspension.

The judgment is reversed and the matter remanded to the trial court with directions to enter judgment denying CDC's petition for writ of administrative mandamus. Wallace shall recover his costs on appeal.

Davis, J., concurred.

SIMS, J.—I respectfully dissent.

The California Department of Corrections (CDC) charged Sergeant Johnny C. Wallace with, among other things, unlawful discrimination pursuant to Government Code section 19572, subdivision (w),[1] which subjects employees to discipline for unlawful discrimination. I agree with the trial court that unlawful discrimination was shown, and the State Personnel Board (Board) abused its discretion in concluding Wallace's free speech rights precluded discipline for unlawful discrimination. I would affirm the trial court's decision to direct the Board to set aside its decision and reconsider appropriate punishment.[2]

The record shows, and the Board found, Sergeant Wallace resented Hispanic officers receiving preferential treatment under CDC's affirmative

---

[1] Government Code section 19572 provides in part: "Each of the following constitutes cause for discipline of an employee . . . [¶] . . . [¶] (w) Unlawful discrimination, including harassment, on the basis of race, religious creed, color, national origin, ancestry, disability, marital status, sex, or age, against the public or other employees while acting in the capacity of a state employee."

[2] The Board's exercise of discretion must be upheld unless it has been abused. (*Nightingale* v. *State Personnel Board* (1972) 7 Cal.3d 507, 515 [102 Cal.Rptr. 758, 498 P.2d 1006].) With respect to the question whether the administrative agency abused its discretion, we conduct de novo review and do not defer to the trial court's decision. (*Cummings* v. *Civil Service Com.* (1995) 40 Cal.App.4th 1643, 1652 [47 Cal.Rptr.2d 775].) The Board's factual findings are reviewed under the substantial evidence test. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217, fn. 31 [124 Cal.Rptr. 14, 539 P.2d 774].)

action policy. He resented G. Picone, a female Hispanic officer, because he believed she, as a minority female, had received undeserved preferential treatment under CDC's affirmative action policy. Because of this animosity, Wallace criticized Picone to others in the workplace.[3] When Picone asked him to stop, he impliedly refused, slapping the wall in anger and stating through clenched teeth that he was "tired of this Hispanic shit; us white guys are tired of being looked over." When Picone expressed sympathy but defended affirmative action, Wallace grabbed her shirt, shook her and reiterated "We're sick and tired of it."[4]

As found by the Board, the incident upset and frightened Picone and was a contributing factor in her decision to transfer to a different correctional facility. Picone's testimony before the Board supports these findings, as follows:

"Q. . . . [T]his incident bothered you quite a bit?

"A. Yes, it did.

"Q. *Because of that* did you ask to be transferred from DVI [Deuel Vocational Institution]?

"A. Uh—I asked for a job change initially.

"Q. And then that didn't go through?

"A. No.

"Q. So eventually—did you eventually ask for a job transfer?

"A. Yes.

"Q. Would it be correct to state that you are at the other facility as a result of this incident?

"[Relevance objection overruled.]

[3] As Wallace notes, he was not separately charged with misconduct in criticizing Picone to others in the workplace. However, the notice of adverse action did make reference to Wallace's prior criticism of Picone as a factor leading up to the confrontation between Wallace and Picone.

[4] Although Wallace contends there was no evidence of gender harassment, the evidence showed Wallace said the White *males* were tired of getting passed over, and Wallace was told by his superiors that he could not get the favorable assignment he requested because CDC wanted to place minority females in those positions to increase their visibility and demonstrate CDC's commitment to affirmative action.

"Q. Wouldn't it be correct to state that the reason you transferred is because of the incident in the north corridor?

"ADMINISTRATIVE LAW JUDGE CALLIS: That's leading. Why didn't [sic] you transfer? Why didn't [sic] you seek to transfer to Northern California Women's Facility?"

"THE WITNESS: To get away from all the negative stuff and to see how—I was not even able to get a job change. And *situations like this* were occurring and the racism was just getting kind of worse throughout the institution.

"[ALJ]: Was this the result of the actual incident with Sergeant Wallace or as the result of the aftermath after the complaint was made and he was fired? If you can tell?

"THE WITNESS: I think it all—

"[ALJ]: All of it?

"THE WITNESS: Yes."

". . . . . . . . . . . . . . . . . . . . . . . . .

"[ALJ]: . . . After this incident took place and these things were said between you and Sergeant Wallace, would you have had reservations working for Sergeant Wallace after that?

"THE WITNESS: Yes.

"[ALJ]: And why is that?

"THE WITNESS: Because of the way he felt towards me. There was a lot of hate, and I would not feel safe working around him or with him.

"[Q. by CDC's counsel]: Can you explain why you—to a layman, why you wouldn't feel safe working around him?

"A. Because if someone hates a person that bad, I would think if anything were to happen, I would not feel comfortable with him backing me.

"Q. In what kind of situations do you mean?

"A. If there was an emergency situation occurring, I would not feel comfortable." (Italics added.)

These circumstances establish that Wallace engaged in unlawful discrimination unprotected by the constitutional guarantee to freedom of speech. I will first explain that, setting aside the First Amendment question, Wallace's conduct (words and actions) constituted unlawful discrimination. I will then explain that the Board abused its discretion in dissecting the statements from the manner of delivery. Finally, I will explain why the unlawful discrimination is not protected by the First Amendment, though speech was one vehicle through which Wallace violated the regulation against unlawful discrimination.

## I. *Unlawful Discrimination*

The Board apparently concluded there was no unlawful discrimination because this was a private discussion in which Wallace expressed his own personal views, a single incident which was not severe or pervasive enough to create a hostile work environment. I disagree.

CDC could rightfully conclude Wallace's conduct—verbal and nonverbal—in its entirety created a hostile work environment for a female Hispanic officer in violation of federal and state laws against discrimination in employment.

"Title VII of the Civil Rights Act of 1964 [(42 U.S.C. § 2000e et seq.)] makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' [Citation.] As [was] made clear in *Meritor Savings Bank, FSB* v. *Vinson*, 477 U.S. 57 (1986 [106 S.Ct. 2399, 91 L.Ed.2d 49], this language 'is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment. [Citations.] When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' [citation], that is 'sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment' [citation], Title VII is violated." (*Harris* v. *Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 [114 S.Ct. 367, 370, 126 L.Ed.2d 295, 301], italics added [tangible psychological injury is not required for title VII claim].) "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be

abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." (*Id.* at pp. 21, 22 [114 S.Ct. at p. 370, 126 L.Ed.2d at p. 302].)

Similar standards apply under California's Fair Employment and Housing Act (FEHA), Government Code section 12940 et seq. (*Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 606 [262 Cal.Rptr. 842].)

As indicated by the majority, CDC is required to engage in affirmative action in order "to eliminate and rectify present effects of past discriminatory employment practices . . . ." (Cal. Code Regs., tit. 2, § 547.30.)

Here, Wallace did not merely express opposition to affirmative action. His conduct (words and actions) undermined the affirmative action policy and subjected Picone to an insulting, vile, venomous tirade against her ethnicity, accompanied by a physical assault.

That the conversation occurred in private has nothing to do with whether or not it constituted unlawful discrimination. Unlawful discrimination often occurs outside the presence of witnesses. That the affirmative action topic was a matter of public concern, as found by the Board, goes to the First Amendment question, not the question whether Wallace's conduct constituted unlawful discrimination.

It does not matter that Wallace was not speaking on behalf of CDC in expressing his own personal views opposing CDC policy. The FEHA prohibits not only "employers" but also "any other person" from harassing an employee because of race, color, national origin, ancestry, sex, etc. (Gov. Code, § 12940, subd. (h)(1).) Harassment of an employee by an employer's agents or supervisors is unlawful. (Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(2).) Harassment by a nonsupervisorial employee is unlawful if the employer, its agents or supervisors (1) knows of such conduct and fails to take immediate and appropriate corrective action, or (2) should have known (unless employer shows it took reasonable steps to prevent harassment from occurring). (Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(3).) Although Wallace was not Picone's supervising officer at the time in question, he was a supervisor and a superior officer who outranked Picone. In the paramilitary organization of CDC, Wallace plainly had authority over Picone. I agree with the trial court that it was clear Wallace was in a position to hamper Picone's career and negatively affect her position with CDC.

It does not matter that Wallace testified he bears no animosity against any minorities generally, and had coworkers testify to the same effect. As found

by the Board, Wallace was resentful about Picone and other Hispanics receiving preferential treatment in job assignments, interfering with his own ability to attain a more favorable assignment.

It does not matter that the tirade occurred only once. An isolated incident, if severe enough, can constitute unlawful discrimination creating a hostile work environment. Thus, *Harris* v. *Forklift Systems, Inc., supra,* 510 U.S. 17 [114 S.Ct. 367, 126 L.Ed.2d 295], though involving multiple incidents, said, "the very fact that the discriminatory conduct was so severe *or* pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of work-place equality." (*Id.* at p. 22 [114 S.Ct. at p. 371, 126 L.Ed.2d at p. 302], italics added.) *Harris* further stated: "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [N]o single factor is required." (*Id.* at p. 23 [114 S.Ct. at p. 371, 126 L.Ed.2d at pp. 302-303], italics added.) Thus, multiple incidents are not required. (See also *Ellison* v. *Brady* (9th Cir. 1991) 924 F.2d 872, 877-878 [dictum: single act may be enough if sufficiently severe]; *Simon* v. *Morehouse School of Medicine* (N.D.Ga. 1995) 908 F.Supp. 959, 969-970 [though other acts were also alleged, allegation of rape, even if it stood alone, would be sufficiently severe to meet the Supreme Court's *Harris* test, which requires only severe *or* pervasive conduct]; Achampong, *Employer Liability for Hostile Environment Sexual Harassment Based on a Single Occurrence* (1995) 12 Hofstra Lab. L.J. 187.)

Wallace cites *Proksel* v. *Gattis* (1996) 41 Cal.App.4th 1626 [49 Cal.Rptr.2d 322], and *Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d 590, for the proposition that a single incident will not suffice to show hostile work environment. However, *Fisher* (in which the statement was dictum) predated the United States Supreme Court decision in *Harris. Proksel* merely cited *Fisher* in a footnote seemingly unnecessary to the opinion, without mentioning *Harris.* (*Proksel, supra,* 41 Cal.App.4th at p. 1630, fn. 5 [plaintiff had no viable claim, where only complaint was that employer showed favoritism to another employee, with whom he was having a consensual affair].)

Thus, a single incident may suffice.

"[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."

(*Ellison* v. *Brady, supra,* 924 F.2d at p. 878.) The context of the incident is also critical. "[R]emarks accompanied by threatening gestures or contorted facial features, or delivered from so short a distance from the listener's face as to invade the listener's private space" may render severe conduct with might be considered mildly offensive absent such circumstances. (*Baskerville* v. *Culligan Intern. Co.* (7th Cir. 1995) 50 F.3d 428, 431 [suggestive sexual comments spread out over seven months did not create hostile work environment].)

Here, the incident between Wallace and Picone was severe. Wallace made physically threatening gestures, clenched his teeth, became red with rage, and spoke close to Picone while shaking her by her shirt.

It is also clear Picone subjectively perceived a hostile work environment. Though she saw anti-ethnic bias by persons other than Wallace, Wallace was clearly the catalyst that forced her out of the workplace.

I agree with the trial court that Wallace engaged in unlawful discrimination. The question is whether the First Amendment protects him from the consequences of his unlawful discrimination because part of the discrimination took the form of speech.

## II. *Dissection of Words and Actions Improper*

The Board said the content of Wallace's statements was entitled to First Amendment protection, but his "manner of delivering the statements," i.e., his physical actions and use of derogatory, profane language, was not. The majority, while acknowledging the legal principle that Wallace's statements must be viewed together with their time, place, manner and context (*Rankin* v. *McPherson* (1987) 483 U.S. 378, 384-385 [107 S.Ct. 2891, 2897, 97 L.Ed.2d 315, 324-325]), approve this isolation of some words from other words and from actions. (Maj. opn., *ante,* at pp. 145-147.) I disagree.

Wallace was not charged with merely speaking generally about affirmative action. He was charged with unlawful discrimination against a female Hispanic officer.

There is a difference between an academic discussion regarding affirmative action and a verbal and physical tirade by a superior officer against a female, Hispanic, lower officer in a quasi-military organization, accompanied by the use of force.

The majority would require CDC to isolate words from the manner of delivering them, and punish only the accompanying conduct, without consideration of the words.[5] I disagree.

Constitutional law requires that we look at the statements in context. We cannot dissect the words from the manner of delivery in determining whether Wallace created a hostile work environment.

Thus, the majority recognize the United States Supreme Court has said that, in balancing the public employee's interest in making statements of public concern against the government employer's interest in promoting the efficiency of the public services it performs, "the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose. . . ." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 388 [107 S.Ct. at p. 2899, 97 L.Ed.2d at p. 327].)

According to the majority, this holding in *Rankin* and other cases does not prohibit consideration of the content of statements in isolation from accompanying, offensive conduct, because in *Rankin* and other cases it was the content of the employee's statement which made it damaging to the employer. (Maj. opn., *ante,* at p. 147.) However, in those cases there was no accompanying, offensive conduct to consider, or any accompanying conduct *was* considered. Thus, in *Rankin,* the employee was discussing with her coworker/boyfriend a news report of an assassination attempt against the president and said, " 'if they go for him again, I hope they get him.' " (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 381 [107 S.Ct. at p. 2895, 97 L.Ed.2d at p. 322].) In *Waters* v. *Churchill* (1994) 511 U.S. 661 [114 S.Ct. 1878, 128 L.Ed.2d 686], the employee made comments critical of the employer to a coworker during a dinner break. In *Gray* v. *County of Tulare* (1995) 32 Cal.App.4th 1079 [38 Cal.Rptr.2d 317], a captain in the sheriff's department made statements reported in a local newspaper criticizing the sheriff. The accompanying conduct *was* considered, in that the court considered among other things the fact that the employee "arranged to meet with a reporter to deliver comments he had prepared in advance," thus assuring the widest possible distribution. (*Id.* at p. 1094.)

Moreover, the United States Supreme Court has indicated that context (as well as content) matters most particularly where, as here, the speech occurs in a private conversation, rather than a public forum. Thus, in concluding a public schoolteacher did not forfeit First Amendment protection by speaking

---

[5]The majority and the Board treat vulgar, profane language as "accompanying conduct" rather than speech.

privately to the school principal rather than publicly, the court said: "When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they [disrupted the workplace]. [Citation.] Private expression, however, may in some situations bring additional factors to the . . . calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." (*Givhan* v. *Western Line Consol. School Dist.* (1979) 439 U.S. 410, 415, fn. 4 [99 S.Ct. 693, 696, 58 L.Ed.2d 619, 624], original italics.)

Thus, I believe CDC abused its discretion in isolating Wallace's statements from the manner of delivering them.

Even if we could or should dissect words from accompanying conduct, words such as "I am tired of this Hispanic shit," spoken in this time, place, manner and context, are not protected by the First Amendment. They are extremely derogatory, directly referring to Picone's ethnicity, and when spoken by a superior officer in a quasi-military organization, carry an implicit threat to make her life at work miserable. They constitute "fighting words." (*In re John V.* (1985) 167 Cal.App.3d 761 [213 Cal.Rptr. 503] [affirming misdemeanor conviction for use of offensive words ("fucking bitch") in public place likely to provoke immediate violent reaction].) "In California it is well established that the First Amendment does not protect words specifically addressed to another spoken under circumstances which create a clear and present danger that violence will imminently erupt. [Citation.] '[T]he mere use of a vulgar, profane, indecorous, scurrilous, opprobious epithet cannot alone be grounds for prosecution. . . . The context in which the words are used must be considered, and there must be a showing that the words were uttered in a provocative manner, so that there was a clear and present danger violence would erupt.' [Citation.] Although protected conduct may begin with the expression of opinion, it must stop with the perpetration of violence. [Citation.]" (*Id.* at p. 768.)

III. *Unlawful Discrimination Is Not Protected Free Speech*

There is ample authority supporting a conclusion that unlawful discrimination is not protected by the constitutional guarantee of free speech.

Indeed, in an era *before* affirmative action became the state's policy, the United States Supreme Court held the First Amendment's free speech guarantee was not violated by allowing California courts to restrain peaceful picketing designed to force an employer to engage in a form of affirmative

action in violation of the state's policy calling for equal treatment of all. (*Hughes* v. *Superior Court* (1949) 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985].) The picketers there were a citizens' group which had asked Lucky Stores to hire only Blacks, as positions became available, until the proportion of Black to White clerks approximated the percentage of Black customers (50 percent). (*Id.* at pp. 461-462 [70 S.Ct. at p. 719, 94 L.Ed. at p. 990].) When Lucky refused, the citizens' group began picketing the store carrying placards stating Lucky refused to hire Black clerks in proportion to Black customers. (*Ibid.*) The United States Supreme Court held a California state court's injunction restraining the picketers did not violate the right of freedom of speech. The court observed the picketing was contrary to the state's judicially declared policy condemning " 'arbitrary discrimination upon the basis of race and color alone, rather than a choice based solely upon individual qualification for the work to be done.' " (*Hughes, supra*, 339 U.S. at p. 463 [70 S.Ct. at p. 720, 94 L.Ed. at p. 991].) "The Constitution does not demand that the element of communication in picketing prevail over the mischief furthered by its use in these situations." (*Id.* at p. 464 [70 S.Ct. at p. 721, 94 L.Ed. at p. 992].) "We cannot construe the Due Process Clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would subvert such policy." (*Id.* at p. 466 [70 S.Ct. at p. 722, 94 L.Ed. at p. 993].)

*Hughes* is distinguishable, because picketing has been recognized as a particularly potent mode of communication intended to induce action. (*Hughes* v. *Superior Court, supra*, 339 U.S. at p. 465 [70 S.Ct. at p. 721, 94 L.Ed. at p. 992].)

Nevertheless, the Supreme Court has also recognized there are other circumstances where expression, including unlawful discrimination, may be regulated because of its "secondary effects" rather than its content.[6]

Thus, in *R. A. V.* v. *St. Paul* (1992) 505 U.S. 377 [112 S.Ct. 2538, 120 L.Ed.2d 305], the Supreme Court invalidated a city ordinance which provided: " 'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.' " (*Id.* at p. 380 [112 S.Ct. at p. 2541, 120 L.Ed.2d

---

[6]Although CDC does not argue the secondary effects doctrine, I believe its argument that Wallace engaged in unlawful discrimination fits within the secondary effects doctrine as a matter of law.

at p. 315].) An individual prosecuted for burning a cross on a Black family's lawn argued the ordinance violated free speech rights. The *R. A. V.* court agreed, faulting the ordinance for not proscribing all fighting words but only a subclass based on race, etc., because of their content. (*Id.* at p. 391 [112 S.Ct. at p. 2547, 120 L.Ed.2d at p. 323].) The gist of *R. A. V.* is that "while certain categories of speech and expressive conduct may be regulated, such regulation may not discriminate *within that category* on the basis of content." (*In re Steven S.* (1994) 25 Cal.App.4th 598, 610 [31 Cal.Rptr.2d 644], original italics [upholding statute prohibiting cross-burning on private property of another, though statute discriminated on basis of content].)

However, *R. A. V.* enunciated several exceptions to the rule, one of which allows the prohibition of expression because of its *secondary effects* rather than its content. "[A] valid basis for according differential treatment to even a content-defined subclass of proscribable speech is that the subclass happens to be associated with particular 'secondary effects' of the speech, so that the regulation is 'justified without reference to the content of the . . . speech,' [citations]. A State could, for example, permit all obscene live performances except those involving minors. Moreover, since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets), a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. [Citations.] *Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices*, [citations]. Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."[7] (*R. A. V.* v. *St. Paul, supra,* 505 U.S. at pp. 389-390 [112 S.Ct. at pp. 2546-2547, 120 L.Ed.2d at pp. 321-322], italics added, original italics deleted.)

[7]This court held in *Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302 [141 Cal.Rptr. 354], that a highway patrol officer's dismissal for insubordinate utterances to his superiors under Government Code section 19572 did not violate his free speech rights. We said the exercise of First Amendment freedoms could be regulated by general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise, when a proper governmental interest was served thereby. (74 Cal.App.3d at p. 306.) "[T]he highway patrol's interest in developing discipline, *esprit de corps,* and good morale among its members far outweighs any legitimate interest which [the employee] could assert in undermining those efforts with unsolicited, disparaging remarks to or about his commanding officers in the course of duty." (*Ibid.*)

Such content-neutral regulations are acceptable "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." (*Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41, 47 [106 S.Ct. 925, 928, 89 L.Ed.2d 29, 37] [upheld zoning ordinance prohibiting adult motion picture theaters

In *R. A. V.*, the city argued the ordinance came within the secondary effects theory because the ordinance was intended not to inhibit free expression but rather to protect against the victimization of persons who were particularly vulnerable because of their membership in a group that historically had suffered discrimination. (*R. A. V.* v. *St. Paul, supra*, 505 U.S. at p. 394 [112 S.Ct. at p. 2549, 120 L.Ed.2d at p. 325].) The court said that, even assuming an ordinance that completely proscribed, rather than merely regulated, a specified category of speech could ever be considered to be directed only to the secondary effects of such speech, the ordinance in question was not directed to secondary effects. Listeners' reactions or the emotive impact of speech on the audience were not "secondary effects" within the meaning of that principle. (*Ibid.*)

The United States Supreme Court has subsequently explained that *R. A. V.* is limited to restrictions directed at expression rather than conduct. Thus, *Wisconsin* v. *Mitchell* (1993) 508 U.S. 476 [113 S.Ct. 2194, 124 L.Ed.2d 436], held a criminal defendant's First Amendment free speech rights were not violated by an enhanced prison sentence for aggravated battery under a state "hate crimes" statute authorizing enhancement when the victim was selected because of race. The defendant there argued the penalty-enhancement statute violated his First Amendment rights by punishing him for bigoted beliefs (discriminatory motive) rather than for conduct. The court disagreed, stating, "motive plays the same role under the [penalty-enhancement] statute as it does under federal and state antidiscrimination laws, which we have previously upheld against constitutional challenge. [Citations.] Title VII, . . . for example, makes it unlawful for an employer to discriminate against an employee '*because of* such individual's race, color, religion, sex, or national origin.' [Citation.] . . . [*Hishon* v. *King & Spalding* (1984) 467 U.S. 69, 78 [104 S.Ct. 2229, 2235, 81 L.Ed.2d 59, 68-69], . . . rejected the argument that Title VII infringed employers' First Amendment rights. And more recently, . . . [*R. A. V.* v. *St. Paul, supra*, 505 U.S. 377 [112 S.Ct. 2538, 120 L.Ed.2d 305], . . . cited Title VII . . . as an example of a permissible content-neutral regulation of conduct.

"Nothing in [*R. A. V.*] compels a different result here. That case involved a First Amendment challenge to a municipal ordinance prohibiting the use of ' "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion or gender." ' [Citations.] Because the ordinance only proscribed a class of 'fighting words' deemed particularly offensive by the

from locating near residential zones, churches, parks or schools; ordinance was aimed at secondary effect of urban blight, not content of films]; but cf. *Sebago, Inc.* v. *City of Alameda* (1989) 211 Cal.App.3d 1372 [259 Cal.Rptr. 918] [no basis for city's assertion that adult newsracks (as opposed to adult bookstores or theaters) cause urban blight].)

city—*i.e.*, those 'that contain . . . messages of "bias-motivated" hatred,' [citation]—[the court] held that it violated the rule against content-based discrimination. [Citation.] But whereas the ordinance struck down in *R. A. V.* was explicitly directed at expression (*i.e.*, 'speech or messages') [citation], the [penalty-enhancement] statute [at issue] in this case [(*Mitchell*)] is aimed at conduct unprotected by the First Amendment." (*Wisconsin* v. *Mitchell*, *supra*, 508 U.S. at p. 487 [113 S.Ct. at p. 2200, 124 L.Ed.2d at pp. 446-447], original italics.)

In the *Hishon* case, to which *Mitchell* referred, the Supreme Court held a female attorney employed by a law partnership stated a claim cognizable under title VII where she alleged the partnership discriminated against her when it failed to invite her to become a partner. *Hishon* rejected the law firm's argument that application of title VII would infringe constitutional rights of expression or association, stating in part " '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.' " (*Hishon* v. *King & Spalding* (1984) 467 U.S. 69, 78 [104 S.Ct. 2229, 2235, 81 L.Ed.2d 59, 68-69].)

The target of the employment discrimination laws is the secondary effect of such conduct—employment discrimination—not its expressive content nor its mere emotive impact on listeners.

"A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." (*Harris* v. *Forklift Systems, Inc.*, *supra*, 510 U.S. at p. 22 [114 S.Ct. at pp. 370-371, 126 L.Ed.2d at p. 302].)

Here, the discriminatory conduct occurred in an anti-affirmative-action speech. Public agencies were required at the time to have affirmative action programs in order to correct past unlawful discrimination. Wallace expressed a bias against Picone based on her sex and ethnicity, because her sex and ethnicity gave her advantages under the affirmative action program. Wallace created an abusive work environment by engaging in constitutionally unprotected conduct—unlawful discrimination—rather than protected expression. This is more than free expression in a rude or impolite manner; it is unlawful discrimination.

I agree with the trial court that the Board's decision "has the potential of signaling to all disgruntled state workers an 'open season' on minority

subordinates, to unleash venomous epithets under the guise of protected speech. While it is true that, in a proper setting, at the proper time, comments identical to those uttered by [Wallace] might well be deemed protected speech, the Constitution affords no protection for [Wallace] under the circumstances of this case."

The trial court was correct in recognizing that this particular speech was not protected by the First Amendment.

## IV. *Disruption*

On appeal, CDC cites authority for the proposition that potential, rather than actual, harm suffices (*Waters* v. *Churchill, supra,* 511 U.S. 661 [114 S.Ct. 1878, 128 L.Ed.2d 686]),[8] but CDC does not identify any "potential" disruption. Nevertheless, I agree with the trial court that the Board's decision "has the potential of signaling to all disgruntled state workers an 'open season' on minority subordinates, to unlease venomous epithets under the guise of protected speech."

*Waters* v. *Churchill, supra,* 511 U.S. 661 cited among other cases *Connick* v. *Myers* (1983) 461 U.S. 138, 151-152 [103 S.Ct. 1684, 1692-1693, 75 L.Ed.2d 708, 723], which said: "When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. [A]n employer [need not] allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. [Fn. omitted.] [The United States Supreme Court] caution[ed] a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."

I do not believe a stronger showing was required in this case. Wallace was not speaking out in order to bring to light any malfeasance or nonfeasance by CDC. He merely disagreed with state policy as it existed at that time. While he was entitled to his opinion, he was not entitled to engage in conduct (verbal or nonverbal) which constituted unlawful discrimination creating a hostile work environment.

---

[8]Wallace suggests *Waters* is unimportant because there was no majority opinion but only a plurality opinion. However, the concurring and dissenting opinions did not dispute whether potential disruptiveness sufficed. The point of contention related to whether an employer should have to conduct an investigation to determine what the employee said.

Wallace also argues *Waters* is distinguishable because it concerned an employee at will rather than one with civil service tenure. However, *Waters* did not limit its discussion to at-will employees.

Deference to the public employer's perception of potential disruptiveness is particularly appropriate where, as here, the case involves correctional officers in a state prison, where close working relationships are essential to fulfilling the public responsibilities. Thus, some protected speech might disrupt "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." (*Pickering* v. *Board of Education* (1968) 391 U.S. 563, 570 [88 S.Ct. 1731, 1735, 20 L.Ed.2d 811, 818] [schoolteacher did not have close working relationship with school board or superintendent].) The law enforcement profession "impose[s] upon its servants certain ' "responsibilities and limitations on freedom of action which do not exist in other callings. [Citations.]" ' " (*Anderson* v. *State Personnel Bd.* (1987) 194 Cal.App.3d 761, 771 [239 Cal.Rptr. 824].) "[L]aw enforcement agencies [are] essentially paramilitary organizations in which discipline and loyalty are especially important." (*Gray* v. *County of Tulare, supra,* 32 Cal.App.4th at p. 1092 [upholding dismissal of county sheriff's captain for, among other reasons, making statements in newspaper alleging that newly elected sheriff was misusing resources and prerogatives of his office to punish his political enemies within the department].)

Moreover, *actual* disruption was shown in this case.

The Board found there was no actual disruption, stating: "The discussion . . . took place in privacy. There were no inmates or other officers around at the time that the discussion took place. [Wallace] made it clear that he was expressing his own opinion when he made his remarks to [Picone] and made no pretense that he was discussing the matter in his supervisory capacity or as a spokesperson for the Department. Indeed, since the entire thrust of [Wallace's] remarks was to criticize departmental policy in such cases, there was little danger that [Picone] could have misconstrued the private nature of [Wallace's] views. Given these facts, it is unlikely that [Wallace's] remarks, even if disseminated, would have discredited the agency in any fashion since they were merely his private expression of his opinions."

I believe the Board applied the wrong standard.

Thus, the balancing of employee versus employer interests includes as pertinent considerations "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with

the regular operation of the enterprise." (*Rankin* v. *McPherson, supra,* 483 U.S. at p. 388 [107 S.Ct. at p. 2899, 97 L.Ed.2d at p. 327].)

Wallace's statements had a detrimental impact on close working relationships for which personal loyalty and confidence were necessary. Thus, the Board (while finding no "injury" to Picone), found Picone was frightened and upset by the incident with Wallace. The Board also apparently found a cause and effect relationship between the incident and Picone's departure from the workplace, because the Board said: "Following the incident with [Wallace], [Picone] asked for a job change. When the job change was denied, she decided that she wanted to transfer from the institution. She subsequently received a transfer to the Northern California Women's Facility where she was employed at the time of hearing. She testified that she would have reservations about working for [Wallace] as a Sergeant because of his statements to her. She felt that those statements expressed hatred towards her because of her race [*sic*]."

Though Picone indicated she was bothered by racism throughout the institution, not just from Wallace, the fact remains Wallace was a substantial contributing factor in her transfer. I am not aware of any authority holding that an employee who disrupts working relationships through unlawful discrimination is immune from discipline if others also contribute to the disruption.[9] Nor am I aware of any authority that would compel CDC to show economic detriment to Picone in order to establish workplace disruption.

Here, there was clearly a disruption of close working relationships, caused by Wallace. This breakdown was particularly important because of the nature of their jobs as correctional officers in a prison. In this quasi-military environment, employees may have to depend on each other for their safety.

Although the majority say CDC on appeal does not attribute any harm to CDC from Wallace's comments (maj. opn., *ante,* at p. 148), CDC does argue Wallace's conduct caused a disruption in Picone's career with CDC and caused her to obtain a transfer. This was a disruption not only for Picone, but

---

[9]Note this is not a case where the disruption is caused by the employer's misconduct, and the employer tries to punish an employee who contributes to the disruption by speaking out in protest or by participating in the disruption caused by the employer. Nor is this a case where a disruption is caused by an employer's reaction to an employee's speech. "Public employers cannot rely on disruption which they have instigated or exacerbated to outweigh an employee's first amendment rights." (*Chico Police Officers' Assn.* v. *City of Chico* (1991) 232 Cal.App.3d 635, 651 [283 Cal.Rptr. 610].) Although Wallace was reacting to CDC's affirmative action policy, I do not view the disruption as having been instigated by CDC.

for CDC as well, because the employer's interests include harmony among coworkers.[10]

I would hold the trial court got it right. Wallace's verbal and nonverbal conduct, considered together, constituted unlawful discrimination unprotected by the First Amendment. I would therefore affirm the trial court's decision.

---

[10]Wallace cites cases where public employees' speech regarding discrimination was held to be protected speech, but in those cases the employee was not engaging in discrimination but was accusing the employer of discrimination.

One such case, *Givhan* v. *Western Consol. School Dist., supra,* 439 U.S. 410, 414 [99 S.Ct. 693, 696, 58 L.Ed.2d 619, 623], is cited by Wallace for the proposition that comments expressed in private have less chance of disrupting the workplace. However, what *Givhan* said was that where a public employee personally confronts a superior rather than speaking publicly, the employer's institutional efficiency may be threatened not only by the content of the message, but also the manner, time and place in which it is delivered. (*Id.* at p. 415, fn. 4 [99 S.Ct. at p. 696, 58 L.Ed.2d at p. 624].) This does not help Wallace. I thus disagree with *Southern Cal. Rapid Transit Dist.* v. *Superior Court* (1994) 30 Cal.App.4th 713, 729 [36 Cal.Rptr.2d 665], which (as noted by Wallace) said *Givhan* recognized the concern for disruptive speech is far less where the employee speaks privately rather than publicly. On the other hand, *Rankin* v. *McPherson, supra,* 483 U.S. at pages 388, footnote 13, 389 [107 S.Ct. at page 2899, 97 L.Ed.2d at page 327] indicated a purely private statement on a matter of public concern will rarely justify discharge of a public employee. There, one worker commented to a coworker (her boyfriend) about a news report of a presidential assassination attempt, stating she hoped the perpetrators would be successful if they tried again. Certainly, a private comment to one other person may be less likely to disrupt a workplace than a comment made to a large group. However, *Givhan* teaches the context is particularly important where the comment is made in private. Wallace's venomous attack on Picone is in no way comparable to the offhand chitchat in *Rankin*.